2004 UT 72

**438 MAIN STREET, a Utah general partnership, and Rainbow Trout, Inc., dba Pop Jenk's, a Utah corporation, Plaintiffs and Appellant,**

v.

**EASY HEAT, INC., a Delaware corporation; Heron Cable Industries, a Canadian corporation; PK Supply, a California corporation; Alpine Electric, Inc., a Utah corporation; Deseret Roofing, a Utah corporation; Moon Roofing, a Utah corporation; Melva Garcia, a resident of the State of Arizona; Dion Hale, a resident of the State of Utah; Quality Interiors, Inc., a Utah corporation, Defendants and Appellee.**

No. 20010629.

Supreme Court of Utah.

Aug. 24, 2004.

Richard A. VanWagoner, Andrew M. Morse, David F. Mull, Salt Lake City, for plaintiff 438 Main Street.

John A. Anderson, Matthew D. Moscon, Salt Lake City, for defendant Easy Heat, Inc.

DURRANT, Justice:

¶ 1 This case involves an appeal from a district court's grant of a rule 41(b) motion to dismiss. Because the district court did not err in considering part of the defendant's evidence when ruling on the motion, and because the district court's findings of fact are not clearly erroneous, we affirm.

## BACKGROUND

¶ 2 At approximately 1:30 on the morning of June 15, 1993, a fire broke out in the 436 Main Street building in Park City, Utah. Despite local firefighting efforts, the fire spread to the neighboring 438 Main Street building. Although the fire was successfully extinguished near dawn, both the 436 and 438 Main Street buildings were substantially damaged.

¶ 3 Plaintiff 438 Main Street ("Plaintiff") believed the fire originated from the exterior southeast corner of the 436 Main Street building and was caused by a deicing cable that had been installed on the roof of the building to melt snow and ice. Specifically, Plaintiff believed the deicing cable had been damaged when it was improperly nailed to a wooden fascia board on the building, and that when the toggle (on/off) switch to the cable was negligently left in the "on" position, the damaged cable overheated and ignited the board to which it was attached, ultimately leading to the destruction of both the 436 and 438 Main Street buildings. Consistent with this theory, Plaintiff filed a complaint against numerous parties, including defendant Easy Heat, Inc. ("Defendant"), the manufacturer of the deicing cable. Pursuant to Utah Code section 78–15–6,[1] Plaintiff alleged that Defendant was strictly liable for the damage caused by the fire because the cable (1) contained defects in its design and manufacture, and (2) failed to include warnings and instructions concerning the cable's installation, maintenance, and use.

---

1. Section 78–15–6 of the Utah Product Liability Act provides, in relevant part, as follows:

   In any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product:
   (1) No product shall be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

   (2) As used in this act, "unreasonably dangerous" means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user or consumer.

   Utah Code Ann. § 78–15–6(1)–(2) (1996).

¶ 4 After a long discovery period, Judge Anthony B. Quinn granted summary judgment in favor of Defendant on Plaintiff's warning claim. One year later, in May 2000, Plaintiff proceeded to try its defect claim in an eight-day bench trial before Judge William A. Thorne. Because one of the primary issues on appeal concerns whether the district court clearly erred in finding that the deicing cable was not the proximate cause of the fire, we describe in detail the extensive evidence that was introduced by both parties to the district court.

## I. PLAINTIFF'S EVIDENCE

¶ 5 During the trial, Plaintiff presented evidence painting the following picture.

### A. The Scene of the Fire

¶ 6 In the early morning hours of June 15, 1993, Bill Ferris, a bartender who worked in the basement establishment of the neighboring 438 Main Street building and the first eyewitness of the fire, purportedly saw flames on the exterior of the 436 Main Street building in the southeast corner at roof level.[2] After calling 911, Mr. Ferris made several attempts to extinguish the fire using two five-gallon buckets until he believed the fire had been put out.

¶ 7 Several witnesses corroborated Mr. Ferris's account, reporting that they too had seen flames originating from the southeast corner of the 436 Main Street building. For example, Robert Anderson, a Park City firefighter who arrived on the scene shortly after the first fire engine unit, saw a small amount of fire coming from the rear of the south end of the building, where a wooden soffit board was attached just below the roof line. Park City Fire District Chief Kelly Gee, who arrived on the scene at approximately 2:00 a.m., also saw fire coming from the rear exterior southeast corner of the building. Finally, Park City Fire Marshal Sam Coleman, who arrived at around the same time as Chief Gee, saw what he described as "remnants" of the fire and smoke

emanating from the southeast corner of the 436 Main Street building.

¶ 8 Although the firefighters proceeded to battle the blaze, they had difficulty extinguishing the fire because it had, according to Captain Robert Burns, spread from the roof of the southeast corner storage room up through the common wall between the 436 and 438 Main Street buildings and into the ceiling space of the 438 Main Street building, where the fire was difficult to reach. Consequently, between an hour to an hour-and-a-half after the first firefighters arrived, two firefighters attempted to trench ventilation holes in the roof of the 436 Main Street building to let the fire out. These efforts were unsuccessful, however, and the fire continued to burn.

¶ 9 At approximately 4:00 a.m., when the fire had grown to such intensity that Chief Gee feared the fire would spread into the building north of the 438 Main Street building, he ordered his firefighters to act defensively and called for help from the Salt Lake County Fire Department. With the aid of these additional firefighters, the fire was finally extinguished later that morning.

### B. Plaintiff's Origin and Causation Experts

¶ 10 At trial, Plaintiff presented five expert witnesses who testified that the fire originated where Defendant's deicing cable was attached to the wooden fascia board near the roof line of the southeast corner of the 436 Main Street building. The first of these was Sam Coleman, one of the firefighters on the scene and an experienced fire investigator who had worked as a fire marshal with Park City for ten years. Mr. Coleman testified that, based on his investigation, he believed the fire probably originated on the exterior southeast corner of the 436 Main Street building. He based this conclusion on the observations of those individuals who had witnessed the fire, including firefighters and police, as well as on his own evaluation of the fire damage in that area. He opined that the fire originated in the space above the ceiling

2. This testimony was introduced through Robert Jacobsen, a plaintiff's expert who interviewed Mr. Ferris during the course of his investigation.

Mr. Ferris did not, himself, testify as to the events on that morning.

but below the roof joists of the southeast storage room of the 436 Main Street building, from where it moved west until it collided with the two walls separating the showroom area from the storage area, burned through those walls and spread into the attic area above the 438 Main Street building showroom.

¶ 11 Mr. Coleman further testified that, based on his identified area of origin, Defendant's deicing cable was the most probable ignition source of the fire. He explained that when investigating the area, he eliminated several other potential sources of ignition, including a nearby ventilation hood and orange communication cable because they showed no signs of damage consistent with their having been the source of the fire. After speaking with Utah Power & Light representatives who examined their electrical equipment, he also eliminated the building's power line as a potential source of the fire. Having eliminated these sources, Mr. Coleman concluded that the only remaining source capable of having started the fire was the deicing cable that he had discovered burned in two. He based this conclusion on his observation that the cable's power cord was plugged into the melted exterior duplex (electrical outlet) in the southeast corner of the 436 Main Street building with the toggle switch controlling the cable in the energized "on" position.

¶ 12 Park City fire marshal Ronald Dean Ivie also opined, through proffered testimony, that there was no other logical source of ignition in the area of origin other than the deicing cable. Mr. Ivie began his cause and origin investigation at 7:00 a.m. on June 15, 1993, approximately one and one-half hours after the fire was put out. He first examined the general overall burn pattern in the buildings. Because the heavier burn damage was located in the southeast corner of the 436 Main Street building, Mr. Ivie concluded that the fire likely began there.

¶ 13 Moreover, Mr. Ivie also concluded that the deicing cable found hanging from the roof in his identified area of origin was the most probable source of the fire. Like Mr. Coleman, Mr. Ivie eliminated other potential sources of ignition. Specifically, he ruled out a nearby electrical service mast (a cylindrical device that brought the main electrical supply into the building) and its attached meters as having caused the fire. Although the conduits had suffered from what he described as two or three blown holes, Mr. Ivie stated that the damage was consistent with arcing and that it did not indicate that the conduits were the cause of the fire. As to the deicing cable itself, Mr. Ivie observed that the switch to the deicing cable was in the "on" position, that the burned remnants of the deicing cable were still plugged into the melted receptacle outlet, that the circuit breaker for the cable's receptacle outlet was tripped, and that one of the conductors on the deicing cable was broken at what appeared to be an electrical staple. Based on these observations, Mr. Ivie reasoned that the deicing cable was the source of the fire.

¶ 14 Following his own investigation later that day, Robert Jacobsen, a burn pattern analyst hired by the insurance carrier of the 436 Main Street building's owner to investigate the origin and cause of the fire, also concluded that it was "pretty clear" the fire started in the southeast corner on the exterior of the 436 Main Street building, just below the roof level. Based on his examination of the scene and recovered evidence, Mr. Jacobsen opined that the fire originated in the southeast corner and progressed along the interior roof line of the 436 Main Street building, through the chases (roof support beams) and into the shared wall between the showroom and storage room. Although he admitted that roof joists closer to his identified point of origin suffered less damage than those joists located farther away, he explained that this was because the fire in other areas had burned for a longer duration in concealed ceiling spaces that firefighters were unable to reach with their hose streams. Because the oxidation that occurred on the interior surface of the corrugated steel roofing above the storage room near the first chase was in a pattern that was consistent with a fire starting there, Mr. Jacobsen concluded that the origin was the southeast corner of the building.

¶ 15 Additionally, Mr. Jacobsen opined that the deicing cable was the cause of the fire. Like Plaintiff's previous experts, he explained that during the course of his investigation he identified and eliminated all other potential sources of ignition in the southeast corner and the roof area. For example, he reasoned that a nearby meter base, which received electrical lines from the utility, was not the cause of the fire because there was no fire damage in the electrical appliance for the circuits, the electrical conductors had accumulated a heavy layer of dust, and the breakers were clean and free of any fire damage or signs of overheating. He ruled out orange communication wires as the cause of the fire because they typically carried only a low voltage and showed no signs of energy, arcing, failure, or heat. Mr. Jacobsen further reasoned that the duplex outlet into which the cable was plugged did not ignite the fire because it too showed no signs of overheating, arcing, or failure. He eliminated a rusty exhaust fan on the roof of the storage room as a fire source because it did not appear to have been used, was obviously in a deteriorated condition and dusty, and was not in the area of fire origin. He also eliminated the swamp cooler as a source of the fire because it was in the "off" position, was free of any heavy charring, and contained no scorch marks on the outside of the grill where marks would have been visible had the cooler ignited the fire. Finally, he ruled out nearby power distribution panels as having started the fire because the electrical conductors were damage free, the fuses in the bottom of the panel were not tripped or fused, the circuit was in an off position, and there were no signs of overheating, arcing, or failure in the electrical component. Having eliminated all these other potential sources of origin, Mr. Jacobsen concluded that the deicing cable was the most probable cause of the fire. He explained that this conclusion was supported by his observation that the heat cable circuit was the only circuit that had been tripped.

¶ 16 Plaintiff's next expert, Michael Foley, was brought in at Mr. Jacobsen's request to investigate the electrical components associated with the fire. His proffered conclusion, consistent with Plaintiff's other experts, was that the fire originated in the southeast corner of the 436 Main Street building near the roof edge and was most likely caused by an improperly installed deicing cable. Like Mr. Coleman, Mr. Ivie, and Mr. Jacobsen, Mr. Foley eliminated the electrical service mast as an ignition source. He explained that the two half-inch diameter holes on the east side of the mast frame were consistent with having been damaged as a result of the fire, and were likely caused when the fire melted the insulation on the conductors and the conductors subsequently came into contact with the conduit, melting a hole in the steel. He further ruled out the swamp cooler and exhaust fan as potential causes of the fire because neither was wired. Mr. Foley also eliminated a nearby communication cable as a potential source of the fire because it was not related to the electrical system of the building. In concluding that the deicing cable was the probable source of origin, Mr. Foley pointed out that the circuit breaker to the outside receptacle (electrical outlet) into which the deicing cable was plugged was the only breaker that had tripped. Moreover, after performing tests on the cable fragment found severed and hanging over the edge of the roof, Mr. Foley also noted that the damage to the cable was consistent with damage caused by electrical arc (the discharge of electric current when it crosses a gap between two wires), which was characteristic of melting not from external heat, but from a localized event.

¶ 17 Based on the burn patterns he had observed and the testing performed on the cable remnant, Mr. Foley reconstructed what he believed had occurred. He reasoned that the deicing cable had been affixed to the roof nine inches below the roof line near the border between the first and second chases, and that the cable was damaged when what must have been a clip used to secure the cable to the roof was overdriven, thereby damaging the cable and leading to the fire.

¶ 18 Finally, John Blundell, a former firefighter and origin and causation expert hired by Plaintiff who investigated the fire two days after it occurred, concluded that the origin of the fire was the southeast corner of the 436 Main Street building near the roof in

the area of the fascia board. Although at the time of his investigation much of the evidence, including the deicing cable, had been removed, Mr. Blundell opined that the fire had started on the interior side of an exterior wood board, probably from a heated nail that had penetrated the wood. From there, he reasoned that the fire went up the chases to the highest point of the storage room roof and into the dead space above the room, and then north into the 438 Main Street building, as well as into the attic above the 436 Main Street building's showroom. Although Mr. Blundell admitted that the concealed area where the storage room roof joists met the exterior wall of the showroom showed a heavier damage than the joists near his point of origin, he explained that the greater burn was a result of the unchecked fire in that space that firefighting efforts and the building's sprinklers were unable to extinguish. In addition, he noted that the damage to the southeast corner was likely slowed by the buckets of water applied by the first eyewitness to the fire, Mr. Ferris, and by subsequent firefighting efforts. When questioned, Mr. Blundell also explained that the fire could not have started in the attic dead space because the fire would have spread horizontally, not down the roof joists to the point of origin. He reasoned that if the fire had started in the attic space, flames should have been seen coming over the 438 Main Street building wall or over the front roof of the 436 Main Street building. Mr. Blundell also concluded that there was a good chance the deicing cable had started the fire.

### C. Plaintiff's Electrical and Flammability Experts

¶ 19 In addition to these five cause and origin experts, Plaintiff also proffered the testimony of two experts who concluded that a damaged deicing cable attached to a fascia board could have been capable of causing the fire. The first was Dr. W. Ronald Kilgore, an expert in electrical engineering and pyrolysis of PVC material (the chemical change experienced by PVC due to heat). Dr. Kilgore examined the deicing cable, photographs, and other evidence recovered from the fire, and spoke with several of Plaintiff's origin and causation experts before concluding that the deicing cable had caused the fire. He explained that the damage the Plaintiff's experts believed to have occurred to the cable's outer PVC jacket probably caused an electrical neutral-to-ground fault, which later opened and allowed electricity to flow into the cable's aluminum braid. He reasoned that as a result of that damage, the interface between the aluminum braid and copper alloy in the cable generated heat, which caused excess oxidation and decreased the conductivity of the connection, thereby generating greater heat and causing a spiral failure that ultimately ignited the wooden fascia board.

¶ 20 Dr. Kilgore tested this theory in his laboratory. He began by slicing open a deicing cable in the same area that was damaged on the cable recovered from the fire, thereby exposing the cable's aluminum braid and neutral wire. This caused a maximum measurable temperature of 176 degrees Fahrenheit. Dr. Kilgore then repeated the same test but severed the neutral wire, which forced all current going through the cable to go through the aluminum/copper connections. As a result of this second experiment, Dr. Kilgore reportedly measured a temperature of 330 degrees Fahrenheit, which he explained that, given time, could produce sufficient heat to ignite the cable's PVC casing.

¶ 21 In reliance on these experiments, Dr. Vytenis Babrauskas, Ph.D., an asserted expert with respect to the flammability of PVC compounds, proffered that the electrical fault in the deicing cable could cause the fascia board to which it was attached to ignite, and that there was a likelihood that an electrical malfunction in the cable would have initiated a fire. He based his conclusion on experiments conducted in which he determined that PVC could cause a sustained flame on adjacent fascia board.

¶ 22 Based on the foregoing evidence, Plaintiff asserted that the Defendant's deicing cable had been damaged when it was improperly nailed to the fascia board of the 436 Main Street building, and that as a result of that damage, the cable overheated when it was negligently left "on" and caused the fire that ultimately damaged Plaintiff's building.

## II. DEFENDANT'S EVIDENCE

¶ 23 Defendant challenged Plaintiff's assertion through the testimony of its own expert witnesses and undermined the credibility and accuracy of Plaintiff's expert witnesses on cross-examination.

### A. Defendant Cast Doubt on Plaintiff's Witnesses' Observations of the Fire

¶ 24 First, Defendant questioned whether witnesses on the scene of the fire actually saw flames on the exterior of the 436 Main Street building. For example, Defendant elicited an admission during cross-examination from Captain Burns, one of the first firefighters on the scene, that when he first arrived he saw only smoke emanating from the roof line along the southeast corner of the 436 Main Street building, and that it was not until firefighters attempted to trench ventilation holes in the roof of the building— approximately an hour to an hour-and-a-half after arriving on the scene—that he first saw flames on the exterior of the building, coming up through the ventilation holes. Defendant also introduced evidence that Lieutenant Ryan, the first police officer on the scene, who attempted to help Mr. Ferris extinguish the fire with a fire extinguisher, reportedly saw fire originating from the inside of the building.[3] Finally, Defendant suggested through the testimony of one of its expert witnesses that eyewitness accounts of flames on the exterior of the building did not necessarily mean the fire originated on the exterior of the building, since flames from a fire on the interior of the building would probably have been visible through the cracks in the area between the top of the trim and fascia board, as well as from any other cracks where the building was joined.

### B. Defendant Introduced Experts Who Challenged Plaintiff's Conclusions

¶ 25 Defendant further introduced testimony from three of its own expert witnesses who concluded, based on their own independent investigations, that the fire neither originated in the southeast corner of the 436 Main Street building, nor was caused by the Defendant's deicing cable. The first of these experts was Robert A. Russell, a veteran fire cause and origin investigator. After reviewing the photographic record, firefighter depositions, and a videotape of the fire, and after inspecting the fire artifacts (the fire-damaged evidence removed from the scene), Mr. Russell concluded that the fire did not originate from either the exterior *or* interior southeast corner of the 436 Main Street building. He explained that he reached this conclusion based on a number of factors. First, he stated that the photographs and artifacts recovered from the fire indicated that the fire traveled from the interior of the building toward the southeast corner—not vice versa. In support of his opinion, Mr. Russell noted the presence of heavy burn patterns in the rafters of the storage shed on the west side, and lighter damage on the east side. He explained that this indicated the fire did not originate in the southeast corner of the building. Although he could not say for certain because the evidence from the scene was not adequately documented, Mr. Russell opined that, based on the available evidence Plaintiff did recover, the fire most likely began in the main structure of the 436 Main Street building (probably in the space above the tin ceiling and below the showroom roof) and moved from there into the storage room.

¶ 26 Mr. Russell also pointed to the presence of numerous artifacts that were inconsistent with Plaintiff's theory that the fire originated in the southeast corner of the storage room. For example, relying on photographs taken at the scene, he noted a significant amount of fuel load (flammable materials) available in the storage room that was not consumed by the fire, including the presence of very combustible thin plywood paneling. Further, he pointed to the end caps on rafters, chases, and other wood artifacts from the alleged area of origin that should have been more badly damaged or consumed if Plaintiff were correct. Mr. Russell also identified shingles and drip edge recovered from the alleged area of origin

---

3. This evidence was introduced through Robert Russell, a defense expert who reviewed the deposition testimony of Lieutenant Ryan during the course of his investigation. Lt. Ryan did not, himself, testify as to what he saw on the morning of June 15th.

that showed very little flame damage, little frame impingement, and very little heat damage. He reasoned that if a fire was roaring from below, as Plaintiffs asserted, the tar and the shingles should have been significantly more damaged, and possibly even burned.

¶ 27 Mr. Russell additionally pointed to the deicing cable itself as suggesting that the fire did not begin in the southeast corner of the building. Most significantly, he noted that the cable's aluminum braid had survived the fire. Because a common paper match can melt aluminum, he reasoned that if Plaintiff's hypothesis were correct, much of the aluminum braid should not have been present following the fire. Since investigators were able to recover all but roughly three to three-and-a-half inches of aluminum braid from the eighty-foot cable, Mr. Russell reasoned that too much aluminum remained from the cable for it to have caused the fire.

¶ 28 Although he could not determine, based on the evidence recovered from the scene, what precisely caused the fire, Mr. Russell concluded that the deicing cable had likely not been damaged as Plaintiff alleged and was not the cause of the fire. In reaching this conclusion, he explained that none of the photographs taken by Plaintiff showed evidence that a clip had actually penetrated the deicing cable. Although in one picture he saw what appeared to be an aluminum nail attaching the cable to the structure, the nail head was clearly off the clip and it was not overdriven. He noted there was no evidence that any of the clips recovered had caused damage to any part of the cable.

¶ 29 Further, Mr. Russell explained that the damage to the cable was consistent with it being damaged as a result of the fire, not with it having been the origin of the fire. He observed that the arcing damage that had occurred in the deicing cable's power cord was consistent with the type of damage one would usually see as a result of a fire, and that the damage caused by the external heat of that fire would have been more than sufficient to trip the cable's circuit breaker almost immediately. Mr. Russell also noted that a nearby television cable with the same configuration as the deicing cable had suffered damage similar to that experienced by the deicing cable.

¶ 30 Finally, Mr. Russell also questioned the accuracy of Plaintiff's expert witnesses' conclusions. First, he countered Mr. Jacobsen's explanation that the fire in the southeast corner had been extinguished or dampened by Mr. Ferris's initial attempt to extinguish the fire and subsequent firefighting efforts, and later reintroduced to the area. He explained that throwing water from five-gallon buckets approximately twelve to fifteen feet in the air would have likely been ineffective at slowing the progress of the fire. Mr. Russell also rebutted Mr. Jacobsen's conclusion that the fire had originated in the southeast corner based on rust patterns in the steel panels above the alleged point of origin. He explained that the patterns were not significant factors in making an origin determination because they indicated only that the fire either burned in that area for a longer period of time or at a higher temperature, and reasoned that the patterns could have simply been caused by tar or other fuels in the location that Plaintiff had failed to document.

¶ 31 Defendant also introduced the testimony of Dr. Russell Ogle, an expert holding a Ph.D. in chemical engineering who had conducted specific research in the field of combustion. After reviewing the file materials and evidence recovered from the scene, Dr. Ogle agreed with Mr. Russell and concluded, based on the fire patterns and his knowledge of how flame spreads, that the fire did not originate in the southeast corner of the 436 Main Street building. Based on fire pattern visible on the concrete wall abutting the southeast corner of the building, he opined that the southeast corner was merely an area of ventilation where the fire escaped from the interior of the building. His observations that the fascia board showed heavier char on the inside, and that the rafters above the alleged point of origin should have been more badly damaged had the fire originated in the southeast corner, were also consistent with Mr. Russell's conclusion that the fire had burned from the interior of the building

toward the exterior—not the other way around.

¶ 32 Dr. Ogle also noted why he thought that the evidence documented and recovered from the scene actually contradicted Plaintiff's theory that the fire began on the exterior southeast corner of the 436 Main Street building. First, he stated that the fascia board to which the cable was allegedly attached was approximately three-quarter inches thick and on a vertical surface. Because flames spread upward, outward, and downward faster than they would have spread inward, Dr. Ogle reasoned that based on the cable's positioning, the fire would have had to burn openly for a full hour before it would have penetrated through the fascia board. He observed that, had such an event occurred, there would have been substantially more damage to the exterior of the building, which was inconsistent with the damage that had actually occurred. He also agreed with Mr. Russell that the damage to the deicing cable recovered from near the alleged point of origin was inconsistent with Plaintiff's theory because too much of the cable's aluminum braid remained.

¶ 33 Additionally, Dr. Ogle explained why he believed Mr. Jacobsen's reintroduction theory was unworkable. He likened the situation to trying to start a campfire with charred logs, and reasoned that because heavily charred fuel is difficult to burn, it was unlikely the fire would have re-entered the southeast corner area and reignited the previously burned wood.

¶ 34 Dr. Ogle also undermined Plaintiff's assertion that the alleged damage to the deicing cable caused by an overdriven nail (or roofing clip) would have been capable of starting the fire. First, he explained that PVC does not ignite. Rather, it experiences pyrolysis, during which it gives off a hydrochloric acid vapor that acts as a fire suppressant. Consequently, he opined that the damaged cable would not have caused the PVC to burn as Plaintiff alleged.

¶ 35 Dr. Ogle further explained that the fault hypothesized by Plaintiff's experts would have been insufficient to ignite or sustain ignition of the cable's PVC jacket. He noted that the autoignition temperature for PVC is approximately 900 degrees Fahrenheit—a temperature far greater than the temperature hypothetically calculated by Mr. Kilgore in his laboratory tests.[4] Moreover, even if the PVC had, in fact, been burning as Plaintiff alleged, Dr. Ogle explained that the cable nevertheless would have been unable to ignite the wooden fascia board to which it was attached due to the "heat sink" effect, an effect that the cold wood of the board would have had on a relatively small flame.

¶ 36 Dr. Ogle also rebutted Mr. Blundell's theory that a damaged deicing cable may have heated a nail driven into the fascia board and caused the fire. He explained that to ignite wood, the nail would have had to be 1200 degrees Fahrenheit, a temperature at which the nail would be burning cherry red. However, because aluminum melts at approximately 1200 degrees, he reasoned that the temperature transferred from the cable to the nail would have to be higher than the cable itself—an impossibility since the cable would have melted long before the heat was transferred through the nail.

## C. Defendant Questioned the Credibility and Methodology of Plaintiff's Experts

¶ 37 Defendant did not limit its rebuttal to the introduction of these defense experts' testimony, however. Defendant also undermined the credibility of Plaintiff's experts by raising questions as to both the methods of their investigations and the accuracy of their results. For example, on cross-examination, Mr. Coleman admitted that during the course of his investigation, he failed to interview either the occupants or owner of the 436 Main Street building, and never spoke with Mr. Ferris, the first eyewitness of the fire.

4. The parties disagree as to whether the tests performed by Dr. Kilgore showed that the deicing cable could produce temperatures in excess of 330 degrees Fahrenheit. Plaintiff maintains that Dr. Kilgore measured 330 degrees Fahrenheit, while Defendant contends that Dr. Kilgore's tests only verified a maximum measurable temperature of 174 degrees Fahrenheit. We need not decide which measurement is accurate since, regardless, either temperature falls well short of the 900 degree Fahrenheit autoignition temperature posited by Dr. Ogle.

He also admitted that during a deposition several years prior to the trial, he was unable to say whether the fire originated on the interior or exterior of the building, and had stated that the deicing cable was likely *not* attached to the fascia board, but rather, simply hung over the side of the roof.

¶ 38 Defendant also pointed to the fact that Mr. Ivie, the only witness to have purportedly seen a clip or staple affixed to the building at the alleged point of origin, admitted that he did not save the clip during his investigation. Moreover, while Mr. Ivie claims to have taken a photograph of the clip, he was apparently never able to produce it.

¶ 39 Further, Mr. Jacobsen conceded on cross-examination that numerous errors had occurred during the scope of his investigation. He failed to save fascia board near the point of origin, failed to save any of the nearby orange communication cables, and failed to save the wiring that provided power to the storage room's exhaust fan. He never spoke with Lieutenant Ryan, the first responding police officer on the scene, and never interviewed the firefighters who fought the fire. Although he interviewed Mr. Ferris, the first eyewitness to the fire, he failed to take a written statement or record his conversation during his investigation. Further, he failed to make any diagrams of the scene, failed to include other ruled-out alternative causes of the fire, and failed to mention his reintroduction theory in his report. He never inspected the actual meters from the meter base, and never retrieved them from Utah Power & Light for preservation after they were removed. He did not return to reexamine the building during its demolition to see if other evidence not visible during his initial investigation indicated an alternative point of origin. And he misplaced evidence recovered from the scene that he was unable to locate for several months.

¶ 40 Mr. Blundell also admitted on cross-examination that, during the course of his brief three-hour investigation he failed to speak with Mr. Ferris, failed to take boards from the area of origin into evidence, failed to take photographs that would have shown more damage on the end of the roof joists in the storage room area than in the center, and

failed to return to the site when the building was demolished. Additionally, he conceded that in his initial report he concluded that the fire originated in the attic space of the 436 Main Street building—not the exterior southeast corner, and that he reached his conclusion as to cause and origin without knowing how long the fire burned.

¶ 41 Defendant's experts were also critical of Plaintiff's experts' methodologies. For example, Dr. Ogle opined that the methodologies employed by Plaintiff's experts, Dr. Kilgore and Dr. Babrauskas, were flawed. Specifically, he questioned Dr. Kilgore's lamp test for determining whether the fault created by a damaged cable could ignite PVC. He noted that in using the lamp test to simulate the effect sunlight would have on heating the cable, Dr. Kilgore used a heat flow approximately three to four times greater than the strength of actual sunlight. He also questioned the tests performed by Dr. Babrauskas, which he noted were conducted by applying flame from a small Bunsen burner onto a fascia board. He explained that to better account for the hypothesized fire conditions, Dr. Babrauskas should have used heated PVC as a heat source instead.

¶ 42 An additional defense expert, Dr. Robert Becherer, an expert with a Ph.D. in theoretical applied mechanics who had done extensive research in the field of electrical engineering, also questioned Dr. Kilgore's methodology. Dr. Becherer reviewed the research conducted by Dr. Kilgore and concluded that none of the tests conducted by Dr. Kilgore were relevant to determining whether the deicing cable in this case caused the fire. He explained that in conducting his testing, Dr. Kilgore failed to relate either the conditions of the test or the results of the test to the particular situation. For example, he noted that in setting up his heat lamp experiment, Dr. Kilgore used a 120 degree temperature to mimic the roof temperatures in Park City without explaining why an east-facing roof would achieve that temperature at night. He also noted that Dr. Kilgore's conclusions were based on theoretical hypotheses and not practical application of the theory through experimentation.

¶ 43 Lastly, Mr. Russell was also critical of Plaintiff's experts' methodologies. He noted that Plaintiff's experts had failed to preserve important evidence from the fire site, including a piece of board and other wood remnants near the point of origin, electrical conductors, a copper wire located near the deicing cable's toggle switch, and any of the circuit breakers other than the one servicing the deicing cable. Mr. Russell also questioned Plaintiff's experts' documentation of the building, noting that Plaintiff did not document (through photographic or any other means) the composition of the roof structure to determine how many layers of roofing material were present, did not measure the ceiling height, or the length and width of any of the rooms, and did not document the electrical circuit structure from the front to the back of the building. He noted that the rafters on the west side of the storage room suffered significant damage but that Plaintiff's experts failed to adequately document the transition area between the storage room and the main building, and observed that none of Plaintiff's experts reexamined evidence during the demolition process of the building, a practice that would have been customary for a fire of this size.

¶ 44 Mr. Russell also questioned whether Plaintiff's experts had properly followed the scientific method during the course of their investigations. For example, he noted that both Mr. Ivie and Mr. Blundell spoke with Mr. Coleman before beginning their own investigation of the cause and origin of the fire, and that Mr. Jacobsen spoke with Mr. Ivie before conducting his investigation. Mr. Russell stated that Plaintiff's experts seemed to have a preconceived notion as to what caused the fire, and proceeded to find a way to explain that identified cause.

¶ 45 Finally, Mr. Russell was critical of the fact that the recovery and storage of the fire's artifacts was not conducted in an approved manner. He observed that the condition of artifacts had changed from the time they were first photographed until the time he was able to examine them, noting, for example, that the charred PVC insulation that was clearly present on the roof structure prior to its removal was no longer present on the artifacts when he reviewed them. He also explained that the boxes in which the artifacts were stored were not identified with any form of marking indicating that they were recovered from a particular case, and that the artifacts themselves "were literally heaped in with artifacts from many other cases." Moreover, he observed that when he first went to inspect the evidence recovered from the scene of the fire, Mr. Jacobsen was unable to locate all the evidence in his custody and possession, including the toggle switch and cable attached to it, until sometime later.

## III. THE DISTRICT COURT'S ACTION FOLLOWING THE PARTIES' PRESENTATION OF EVIDENCE

¶ 46 At the close of Plaintiff's case,[5] Defendant moved for a nonsuit or involuntary dismissal under rule 41(b), which the district court granted. Although Judge Thorne stated that there was "certainly a possibility" that Defendant's deicing cable had caused the fire, he reasoned that "it [did] not rise to the level of more probable than not." Consequently, Judge Thorne entered his findings of fact and conclusions of law, in which he found that "[t]he [Defendant's] roof deicing cable was not the proximate cause of the fire" and that the cable's design was not defective as defined by Utah Code section 78–15–6.

¶ 47 In response, Plaintiff filed an objection to the district court's findings. In that objection, Plaintiff alleged that Judge Thorne's findings of fact were "inaccurate and incomplete." Plaintiff also filed a motion for a new trial, which the district court[6] denied. Plaintiff thereafter filed a timely notice of appeal.

---

**5.** Because Plaintiff was not prepared to rest as scheduled, the parties agreed to accommodate Plaintiff by allowing the introduction of some of Defendant's evidence prior to the conclusion of Plaintiff's case. Consequently, Defendant presented the foregoing testimony from Mr. Russell, Dr. Ogle, and Dr. Becherer before Plaintiff rested its case.

**6.** Judge Leslie A. Lewis, who replaced Judge Thorne, ruled on this motion.

¶ 48 On appeal, Plaintiff argues that this court should reverse the district court and remand for a new trial because (1) Judge Thorne's findings in support of his order granting Defendant's rule 41(b) motion for involuntary dismissal are insufficiently detailed because they fail to disclose the steps by which he reached his ultimate conclusion that the deicing cable was not the proximate cause of the fire and that the design of the cable was not defective; (2) Judge Thorne erred in granting Defendant's rule 41(b) motion for involuntary dismissal because Plaintiff established a prima facie case; (3) Judge Thorne's findings are against the clear weight of the evidence; and (4) Judge Thorne erroneously relied on negligence principles in considering Defendant's rule 41(b) motion on Plaintiff's strict liability claim.[7] Plaintiff also argues that (5) Judge Quinn erred in granting summary judgment on Plaintiff's warning claim. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## STANDARD OF REVIEW

¶ 49 We review the district court's legal conclusions for correctness, and will reverse its factual findings only if they are clearly erroneous. *State v. Wanosik,* 2003 UT 46, ¶ 9, 79 P.3d 937.

## ANALYSIS

## I. SUFFICIENCY OF JUDGE THORNE'S FINDINGS OF FACT

¶ 50 Plaintiff first challenges the sufficiency of Judge Thorne's findings of fact, arguing that they are legally insufficient because they fail to adequately disclose the steps by which he reached his ultimate conclusion on each factual issue. Defendant counters that Plaintiff waived its right to appeal the sufficiency of Judge Thorne's findings because Plaintiff raises the issue for the

first time on appeal. We agree with Defendant.

¶ 51 "[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Brookside Mobile Home Park, Ltd. v. Peebles,* 2002 UT 48, ¶ 14, 48 P.3d 968 (citing *Badger v. Brooklyn Canal Co.,* 966 P.2d 844, 847 (Utah 1998)). This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding. *Badger,* 966 P.2d at 847. For a trial court to be afforded an opportunity to correct the error "(1) the issue must be raised in a timely fashion[,] (2) the issue must be specifically raised[,] and (3) the challenging party must introduce supporting evidence or relevant legal authority." *Brookside,* 2002 UT 48 at ¶ 14, 48 P.3d 968 (quoting *Badger,* 966 P.2d at 847). Issues that are not raised at trial are usually deemed waived. *Id.*

¶ 52 In this case, Plaintiff argues that it raised its objection to the sufficiency of the findings in both its objections to the district court's findings of fact and conclusions of law, as well as before Judge Thorne during a June 29, 2000, hearing. However, we do not find that Plaintiff's objections would have alerted Judge Thorne to the argument it now raises on appeal; namely, that Judge Thorne needed to articulate, in greater detail, the steps by which he reached his ultimate conclusion that the deicing cable was not the proximate cause of the fire.

¶ 53 For example, in its objections to Judge Thorne's findings and conclusions, Plaintiff asserted that the findings were "inaccurate and incomplete." Plaintiff claims that this objection adequately preserved the issue. However, when read in context, Plaintiff's allegation that the findings were "incomplete" refers to Judge Thorne's failure to reference a previous order that specifically prohibited any party from informing the trier of fact about certain settlement terms be-

---

7. Initially, Plaintiff also appealed Judge Thorne's conclusion that defendant Melva Garcia, the owner of the 436 Main Street building, had no duty to call her tenants to remind them to turn off the deicing cable when it was not needed.

After its appeal was filed, however, Plaintiff and Ms. Garcia entered into a settlement and stipulated to a voluntary dismissal. Consequently, Plaintiff's appeal with respect to Ms. Garcia has been dismissed with prejudice.

tween other named defendants, and Ms. Garcia's subsequent revelation of the settlement amount. This objection does not indicate that the findings themselves were insufficiently detailed to disclose how the court reached its decision.

¶ 54 Plaintiff's further objection to Judge Thorne's findings and conclusions in a June 29, 2000, hearing is equally inadequate. During that hearing, Plaintiff asserted only that the findings and conclusions were incorrect or unsupported by the evidence:

> THE COURT: Mr. Morse [attorney for Plaintiff], just so that I'm clear, then, the objection is not so much that these [findings and conclusions] are not adequately reflecting what happened at trial in terms of the conclusion that I reached, but you're objecting to the—there is not a great basis to make those findings in the first place? MR. MORSE: That's right, your Honor. I just disputed some of the evidentiary bases for that, whether they are supported by substantial competent evidence, and the—some of the legal conclusions that flow from them.

It is one thing for a party to say that the judge's findings are erroneous because they are contrary to or unsupported by the evidence, and quite another to say that the findings are insufficiently detailed. Indeed, we can conceive of situations in which a court's findings could be adequately supported by the evidence but nevertheless insufficiently detailed to disclose the steps by which the judge reached his or her conclusions. Because Plaintiff articulated only that the findings were erroneous—not that they were insufficiently detailed—its objection did not adequately put Judge Thorne on notice of the issue now raised on appeal.

¶ 55 Finally, as Defendant accurately observes, Plaintiff failed to argue this issue in its motion for a new trial. Instead, Plaintiff argued that Judge Thorne's factual findings were erroneous because they were "unsupported by substantial competent evidence," were "contrary to law," and "resulted from irregularities in the proceedings that made a fair determination on the merits impossible." As before, the "irregularities" to which Plaintiff referred relate to Ms. Garcia's disclosure

to the trier of fact of the terms of a settlement agreement in violation of an earlier court order. They also refer to Plaintiff's belief that the proffered testimony of Plaintiff's experts, Dr. Kilgore and Dr. Babrauskas, was not fully appreciated by the court—not from irregularities in the form of the findings and conclusions themselves.

¶ 56 Although Plaintiff's objections to Judge Thorne's findings and conclusions were timely, Plaintiff failed to specifically raise its objections and to introduce supporting evidence or relevant legal authority that the findings themselves were insufficiently detailed. Based on these omissions, we find that Plaintiff did not raise this issue in such a way as to afford Judge Thorne an opportunity to correct the alleged error. Therefore, we deem Plaintiff to have waived any argument regarding whether the district court's findings of fact were sufficiently detailed.

## II. RULE 41(b) DISMISSAL

¶ 57 Plaintiff next argues that Judge Thorne erred in granting Defendant's rule 41(b) motion for two reasons. First, Plaintiff asserts that, to survive a motion to dismiss under rule 41(b) of the Utah Rules of Civil Procedure, a plaintiff need only establish a prima facie case, which Plaintiff argues it did. Additionally, Plaintiff argues that a district court should only consider *plaintiff's* evidence in determining whether a defendant is entitled to dismissal under rule 41(b), and that Judge Thorne's consideration of Defendant's evidence in this case was error. We disagree with both assertions.

¶ 58 Rule 41(b) of the Utah Rules of Civil Procedure governs involuntary dismissals and provides, in relevant part, as follows:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff

or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

Utah R. Civ. P. 41(b). As we explained in *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, 20 P.3d 388, a trial judge may properly grant a motion to dismiss under rule 41(b) when the plaintiff has (1) " 'failed to make out a prima facie case,' " *or* (2) " 'when the trial judge is not persuaded by the evidence presented by the claimant.' " *Id.* at ¶ 12 (quoting *Lemon v. Coates*, 735 P.2d 58, 60 (Utah 1987)). In other words, a trial judge may grant a motion to dismiss, even where a plaintiff has established a prima facie case, if the trial judge is nevertheless unpersuaded by the plaintiff's evidence.

¶ 59 The record amply demonstrates that in this case, Judge Thorne was unpersuaded by Plaintiff's evidence:

THE COURT: ... And I'm not convinced that the—that that power cord caused the fire. I reread last night Dr.—

MR. ANDERSON: Brabruska [sic]

THE COURT:—Babruska's [sic] and Dr. Ogle's submissions, and I'm not convinced that there's a probability that this product caused the fire. I think it is certainly a possibility, but it does not rise to the level of more probable than not.... So I'm going to grant—grant a nonsuit based on the representations.

Thus, even if Plaintiff did make out a prima facie case, Judge Thorne did not err in dismissing the case where he, as the trier of fact, was not persuaded by Plaintiff's evidence.

■ ¶ 60 Additionally, a district court is not bound to consider only a plaintiff's evidence when deciding a rule 41(b) motion to dismiss. On the contrary, we explicitly held that a court may properly consider a defendant's evidence in *Desert Livestock Co. v. Utah Power & Light Co.*, 541 P.2d 1111 (Utah 1975). In that case, a district court took a defendant's motion for dismissal under advisement and allowed the defendant to introduce its evidence after the close of the plaintiffs' case. *Id.* at 1113. Upon conclusion of the defendant's evidence, the district

court granted the defendant's motion to dismiss. *Id.* In upholding the district court's decision, we stated as follows:

Having done all this [in granting defendant's motion to dismiss and subsequently entering findings and conclusions], particularly in withholding action on the motion to dismiss, we believe the judge was not only justified procedurally in granting the motion under [r]ule 41(b), Utah Rules of Civil Procedure, but exercised a discretion reserved to himself irrespective of such rule. All of which leads us to conclude that plaintiffs' Points I and II on appeal, having to do with plaintiffs' urgence that the trial court was required to look solely to plaintiffs' evidence in acting on the motion, is without merit.

*Id.*

¶ 61 Plaintiff argues that we should decline to follow *Desert Livestock* because "[t]he court in *Desert Livestock* did not explain how [r]ule 41(b) permits this result, or cite case law supporting its conclusion," and "[m]ore seriously ..., did not explain how a defendant's evidence could possibly be relevant to the question of whether a plaintiff has established a prima facie case—that is, a case that stands on its own." Further, Plaintiff asserts that *Desert Livestock* has been essentially overruled by a subsequent line of cases in which we have stated that "rule 41(b) 'is appropriately applied when the trial judge finds that the claimant has ... failed to make out a prima facie case or when the trial judge is not persuaded by the evidence *presented by the claimant.*' " *Bair*, 2001 UT 20 at ¶ 12, 20 P.3d 388 (quoting *Lemon*, 735 P.2d at 60) (emphasis added). We are unpersuaded by these assertions.

¶ 62 The plain language of rule 41(b) expressly permits the consideration of defense evidence by allowing a district court to "decline to render any judgment until the close of all the evidence." Utah R. Civ. P. 41(b). To adopt Plaintiff's interpretation and prohibit district courts from considering a defendant's evidence would render this language meaningless. Moreover, allowing a district court to consider defense evidence prior to granting a rule 41(b) motion is entirely con-

sistent with our decisions in *Bair* and *Lemon*. Neither *Bair* nor *Lemon* prohibit a trial judge from considering a defendant's evidence when determining whether he or she is "persuaded by the evidence presented by the claimant." *Bair*, 2001 UT 20 at ¶ 12, 20 P.3d 388; *Lemon*, 735 P.2d at 60. Accordingly, we clarify that rule 41(b) allows a trial judge to properly consider defense evidence when determining whether he or she has been persuaded by the plaintiff's evidence.

¶ 63 Our inquiry does not end here, however. We must further determine whether, given the language of rule 41(b) and our decision in *Desert Livestock*, a district court may properly grant a motion to dismiss after having heard only part of the defendant's evidence, as in this case, or whether a district court must wait "until the close of *all* evidence" before making its decision.

¶ 64 We have never before had occasion to address this issue. However, since the Utah Rules of Civil Procedure were fashioned after the Federal Rules of Civil Procedure, we may look to decisions under the federal rules for guidance. *Winegar v. Slim Olson, Inc.*, 122 Utah 487, 491, 252 P.2d 205, 207 (1953). Having done so, we are persuaded by federal decisions interpreting rule 41(b) under the federal rules to allow a district court to properly dismiss a plaintiff's case after the introduction of some, but not all, of a defendant's evidence.

¶ 65 In *Nulf v. International Paper Co.*, 656 F.2d 553 (10th Cir.1981), a district court granted a defendant's rule 41(b) motion after hearing testimony from the defendant's first witness on both direct and cross-examination. *Id.* at 557. In affirming the district court's action, the Tenth Circuit Court of Appeals noted that while "the usual procedure is for the judge to hear the defendant's entire case if he chooses to reserve judgment ... [it could] not see how failing to wait until that point prejudiced the plaintiff." *Id.* at 562. Likewise, in *Sanders v. General Services Administration*, 707 F.2d 969 (7th Cir.1983), the Seventh Circuit Court of Appeals upheld a district court's reconsideration and grant of a defendant's rule 41(b) motion after hearing from three of the defendant's witnesses. *Id.* at 970–71. The court reasoned as follows:

While the Rule seems to contemplate an either-or situation in which the case is either dismissed after plaintiff's case in chief or goes to completion, the Rule does not say that the trial judge must press on to the bitter end even if he has second thoughts about his original ruling. The "may decline to render any judgment until the close of all the evidence" language is permissive and is at least not inconsistent with a 41(b) ruling sometime prior to completion of the trial.

*Id.* at 972. Thus, given that a rule 41(b) motion can be granted at the close of trial, the Seventh Circuit saw "no logical reason why it [could] not be granted sometime between the end of plaintiff's case and the end of the trial." *Id.*

¶ 66 We agree with this reasoning, and hold that a trial judge need not unnecessarily burden the judicial system by reserving his or her decision until the close of all evidence if, after the presentation of some, but not all, of the defendant's evidence, the trial judge is not persuaded by the plaintiff's evidence. *See Winegar*, 122 Utah at 492, 252 P.2d at 207 ("[W]hen the trial is without a jury, the court must eventually weigh the testimony for the purpose of determining where the preponderance is, and there is no reason why it should not so weigh it at the earliest possible time...."); *Grossen v. DeWitt*, 1999 UT App 167, ¶ 9, 982 P.2d 581 (noting that because a bench trial judge is also a fact finder who weighs the evidence and considers credibility, he or she "need not wait until a defendant's essentially superfluous case has been presented to end the trial"). However, we caution that a trial judge should not do so until after a plaintiff has been afforded full opportunity to cross-examine any witness introduced by the defendant. *See Sanders*, 707 F.2d at 972 ("It might well be improper to grant a Rule 41(b) motion midway through defendant's case if the judge weighed the testimony of defendant's unexamined witnesses as well as plaintiff's evidence. In such a situation there is a potential for bias against plaintiff."); *Nulf*, 656 F.2d at 562–63 ("Granting dismissal after direct examination of one defense witness without allowing full cross leaves the possible inference that what

was said on direct, untested by cross, influenced that decision. The proper procedure is to allow cross once direct examination has occurred.").

¶ 67 In this case, we conclude that Judge Thorne did not err in granting Defendant's rule 41(b) motion to dismiss after having heard evidence from three of Defendant's expert witnesses. The record indicates that Plaintiff was given ample opportunity to cross-examine all of Defendant's experts. Consequently, because Judge Thorne was not persuaded by a preponderance of the evidence that the deicing cable either caused the fire or was defectively designed, he did not err in considering Defendant's evidence when granting Defendant's rule 41(b) motion to dismiss.

### III. JUDGE THORNE'S FINDINGS OF FACT

¶ 68 We next turn to Plaintiff's primary challenge on appeal; namely, that Judge Thorne's findings of fact regarding the proximate cause of the fire and the deicing cable's design were against the clear weight of the evidence and therefore clearly erroneous.

¶ 69 Before we address the merits of this issue, however, we first address Defendant's contention that Plaintiff's appeal should be summarily dismissed for failure to marshal the evidence. *See Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991) ("If the appellant fails to marshal the evidence, the appellate court assumes that the record supports the findings of the trial court...."). When challenging the sufficiency of the evidence, "[a]n [a]ppellant must marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence." *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989) (internal quotations omitted); *see also* Utah R.App. P. 24(a)(9). "We apply this deferential standard to trial courts because they are in an advantaged position to evaluate the evidence and determine the facts." *State v. Gamblin,* 2000 UT 44, ¶ 17, 1 P.3d 1108.

¶ 70 Plaintiff suggests that there is no need to marshal the evidence in this case because "the findings are so inadequate that they cannot be meaningfully challenged as factual determinations." *Woodward v. Fazzio,* 823 P.2d 474, 477 (Utah Ct.App.1991) (explaining that when findings are not sufficiently detailed to disclose the evidentiary basis for the court's decision, an appellant need not make futile marshaling efforts and may simply argue that the district court's findings were legally insufficient). We are unpersuaded by this suggestion. Though Judge Thorne's findings may not have been as detailed as would be desired, we do not find them so insufficiently detailed that the facts cannot be adequately marshaled to support them.

¶ 71 Whether Plaintiff has adequately marshaled the evidence in support of Judge Thorne's factual findings is a more difficult issue. Although Plaintiff marshaled all primary evidence that could have supported the district court's findings, it omitted certain minor evidence that, in combination, could substantially support Judge Thorne's finding. Nevertheless, we do not address this marshaling requirement in any detail because, even if Plaintiff adequately marshaled the evidence, Judge Thorne's finding that the deicing cable was not the proximate cause of the fire is not clearly erroneous.

¶ 72 Rule 52(a) of the Utah Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury, ... [f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a); *see also Alta Indus. Ltd. v. Hurst,* 846 P.2d 1282, 1286 (Utah 1993). Viewing the evidence in a light most favorable to the district court, *Alta Indus.,* 846 P.2d at 1286, we do not find that the evidence presented was legally insufficient to support Judge Thorne's findings.

¶ 73 There is no doubt that Plaintiff presented plausible evidence in support of its assertion that the fire originated from the exterior southeast corner of the 436 Main Street building, and that the deicing cable

proximately caused the fire. However, the record demonstrates that Defendant presented evidence that substantially undermined Plaintiff's assertion. For example, Defendant introduced credible expert testimony concluding that, based on the evidence recovered from the scene, the fire could not have originated in the southeast corner of the building—interior or exterior. Defendant also introduced credible expert testimony that a deicing cable, damaged as Plaintiff alleged, would have been incapable of igniting the wooden fascia board to which it was reportedly attached, and therefore could not have caused the fire.

¶ 74 Further, Defendant undermined the conclusions of Plaintiff's experts by raising questions as to the methods of their investigations and the accuracy of their results. On cross-examination, Defendant elicited admissions from several of Plaintiff's experts that their testimony and conclusions had changed since earlier depositions, and concessions that Plaintiff's experts had failed to properly preserve and document evidence from the scene. Defendant's experts also questioned the methodology of Plaintiff's investigations, and pointed to flaws in the accuracy and applicability of their conclusions.

¶ 75 When reviewing a district court's findings of fact on appeal, we do not undertake an independent assessment of the evidence presented during the course of trial and reach our own separate findings with respect to that evidence. Rather, we endeavor only to evaluate whether the court's findings are so lacking in support that they are against the clear weight of the evidence. *See Young v. Young*, 1999 UT 38, ¶ 15, 979 P.2d 338. Thus, while a large volume of evidence presented supports Plaintiff's contention that Defendant's deicing cable proximately caused the fire, equally credible evidence suggests the contrary. Given the technical and complex nature of the factual evidence presented, we cannot say, based on our review of the record, that Judge Thorne's findings were clearly erroneous. Consequently, we decline to reverse the district court's decision on that basis.

¶ 76 Because Judge Thorne's finding that the heat cable was not the proximate cause of the fire was not clearly erroneous, we need not address Plaintiff's remaining arguments with respect to whether Judge Thorne's finding that the deicing cable was not defective was clearly erroneous, whether Judge Thorne erred in relying on negligence principles when considering Plaintiff's strict liability claims, or whether Judge Quinn erred in granting partial summary judgment on Plaintiff's warning claim.

## CONCLUSION

¶ 77 For the foregoing reasons, we affirm the district court's grant of Defendant's rule 41(b) motion to dismiss.

¶ 78 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.