2023 UT App 62

## THE UTAH COURT OF APPEALS

BLANCHE COX,
Appellee,
*v.*
JAMES A. COX,
Appellant.

Opinion
No. 20210455-CA
Filed June 8, 2023

Fourth District Court, Provo Department
The Honorable Lynn W. Davis
The Honorable Robert C. Lunnen
No. 124402230

Brett D. Cragun, Attorney for Appellant

Jarrod H. Jennings, Attorney for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     James and Blanche Cox were married for over 20 years, during which time they had 10 children and acquired a large number of marital assets. In September 2012, Blanche filed for divorce.[1] After 4 years of pretrial litigation and then 14 days of trial, the district court issued a 35-page divorce ruling that settled various issues relating to child custody, child support, alimony, and the division of the marital estate.

---

1. Because the parties share the same last name, we'll follow our normal practice and refer to them by their first names, with no disrespect intended by the apparent informality.

¶2    James now appeals, arguing that many of the court's rulings were not supported by adequate findings. We agree with James with respect to each challenged ruling. We accordingly vacate those rulings and remand for further proceedings.

BACKGROUND

¶3    James and Blanche Cox were married in 1990. During their marriage, they had 10 children and acquired a large number of assets. In September 2012, Blanche filed for divorce. After 4 years of litigation, the case went to trial, and that trial occurred over the course of 14 days between December 2016 and May 2017. In January 2017 (while the trial was proceeding), the court issued a bifurcated divorce decree granting Blanche's request for a divorce and reserving other issues for further hearings and determinations.

1.    The Ruling

¶4    In October 2017, the court issued a 35-page Ruling and Memorandum Decision (the Ruling) that entered findings of fact and legal determinations regarding many issues related to child custody, child support, alimony, and the valuation and division of the marital estate. This appeal implicates the court's findings and determinations regarding essentially three groups of issues: the parties' marital properties, alimony and child support, and marital debts.[2]

*Marital Properties*

¶5    The court found that James and Blanche "enjoyed the benefit or acquired" five properties during their marriage: (1) the

---

2. In this Background, we'll recount the main findings regarding each ruling at issue on appeal, but in some instances, additional relevant findings will be discussed in the Analysis below.

Hildale Home, (2) the Henderson Home, (3) the Eagle Mountain Home, (4) the Rockville Property, and (5) the Cedar Highlands Lots. The court then entered findings and made rulings regarding how to divide the parties' marital interest in each property.

¶6 The Hildale Home: The court found that James built this home (located, as our reference would suggest, in Hildale, Utah) before his marriage to Blanche. The court found that James, Blanche, and their children lived in this property until 2010, after which they moved to a different residence. The court heard testimony that title to the Hildale Home was held by the United Effort Plan Trust (the Trust). But the court then concluded that no evidence had been presented of the value of James's interest in the Trust and that "establishing the value of a beneficial interest in property of the [Trust]" would be "practically and legally impossible." The court acknowledged that Blanche had submitted an appraisal of the Hildale Home at trial (which, according to the record on appeal, estimated its value as being around $200,000), but the court concluded that the appraisal was deficient because it failed to account for costs and fees associated with the Trust ownership. From all this—and without any further explanation— the court then ruled that Blanche was "entitled to an award of $100,000" based on the home's value.[3]

¶7 The Henderson Home: The court found that this home was purchased by James in 2004 for $420,000. It found that after the parties fell behind on mortgage payments, at which point they still owed around $288,000, the house was "lost in a short sale in 2013 for $225,000." The court made a finding that the fair market value of the home at the time, according to Zillow, was $323,861.

¶8 But the court also heard competing testimony from the parties about whether the loss of the home could have been

---

3. With respect to some (though not all) of the dollar amounts included in the rulings at issue, the court added ".00" signifiers. For readability, those have been omitted throughout this opinion.

avoided. From Blanche, the court heard testimony that the home "could have been rented out" but that James refused to sign papers that would have modified the loan and, theoretically, allowed the parties to avoid losing it. From James, however, the court heard testimony that maintaining or leasing the home wasn't actually possible for several different reasons.

¶9      From this, the court found that "[t]he parties would likely have had at least $100,000 in equity to split if they had kept" the Henderson Home and "rented it as suggested by [Blanche] numerous times." The court then ruled that James "should be responsible to, and give [Blanche] credit for, $50,000 in equity representing her share of the lost asset dissipated by him."

¶10      The Eagle Mountain Home: The court found that James and Blanche bought this home in 2009 and made a $120,000 down payment on it, $80,000 of which was borrowed from James's mother. The court found that they moved into the home sometime in 2010 and began using it as their primary residence. James testified that he had at one point intended to sell the Eagle Mountain Home in an effort "to cover all the debts" on the parties' credit cards but that Blanche refused to cooperate with him on the sale. Evidence presented at trial suggested that the home was sold in 2015 by a bankruptcy trustee for $520,000, with the parties still owing $292,000 at that time. Without citing any specific piece of evidence, the court found that if the Eagle Mountain Home had "not been lost to a forced sale, [Blanche] would have been able to receive at least another $25,000 today because of the current market value of $606,000," and the court then ruled that she was "entitled to that sum."

¶11      The Rockville Property: The court described this as a "7.5 acre parcel of farm property" located near Rockville, Utah. In its ruling on how to divide the marital interest in this property, the court referred to evidence it had received indicating that the parties were "forced to sell" the property for $270,000 after falling behind on the mortgage payments, as well as evidence showing

that the parties still owed around $190,000 on the property when it was sold.

¶12 But the court then referred to several sources of evidence it had received that suggested that this property had a higher value and could have been sold for more. For example, it referred to evidence that a realtor had listed what the court thought was a similar 11.4 acre parcel for $1,195,000 (though the court then acknowledged that it was "debatable" whether this comparison provided an accurate valuation for the Rockville Property). The court also noted testimony that a realtor had valued the property at "approximately $900,000" due to "28 [shares of] water rights [that were] attached to it." And the court referred to an "analysis from Zillow" that suggested the property's value was $1,195,000.

¶13 From all this, the court then found that the forced sale of the property for $270,000 was a loss that "cost the parties at least $450,000 each," and the court awarded Blanche "damages of $450,000 offset by monies she did receive in the amount of $42,000."

¶14 The Cedar Highlands Lots: The Cedar Highlands Lots were "two lots down by Cedar City," one of which was around 2 acres and the other around 2.5 acres. The court found that the lots were purchased for $40,000 each sometime in 2003 but that they were later "lost" through a forced sale because of the parties' ongoing failure to pay various taxes and fees.

¶15 At trial, there was conflicting evidence and argument about the amount of the loss suffered by the parties because of the sale of these lots. James testified that the parties lost $60,000, while Blanche claimed that they lost somewhere between $153,000 and $280,000 (with her estimate being largely based on the lots' appreciation in value since the time that the parties had purchased them—and, thus, the parties' loss of potential equity by virtue of the forced sale). The court ultimately found that the parties'

inability to "pay the property taxes and Homeowners Association fees . . . resulted in [an] $80,000 loss to the parties." The court did not explain how it had arrived at the $80,000 amount, nor did it explain how this loss was to be distributed between the parties.

*Alimony and Child Support*

¶16    Blanche's Income: Under an initial subheading of the Ruling that was entitled "The Parties['] Income," the court found that Blanche is "an experienced bookkeeper with QuickBooks who has elected to be employed by About Faceology," but that she was currently a "self employed Uber/Lift driver and has been so since 2015." Under a subsequent subheading entitled "Income of the Parties," however, the court then determined that "[f]or child support purposes [Blanche's] income cannot be imputed at more than [the] minimum wage of $1,257 per month." Elsewhere in the Ruling, and without explanation for the discrepancy, the court found that Blanche's imputed minimum wage income was actually $1,260 per month (rather than $1,257). The court included no explanation for its conclusion that Blanche's income could not be imputed at more than the minimum wage.

¶17    Child Support: At the time of the Ruling, the parties had five minor children. The court initially ordered James to pay $3,781 per month in child support. Elsewhere in the Ruling, however, and again without explanation, the court stated that it was ordering James to pay $3,336 per month in child support.

¶18    Alimony: Turning to alimony, the court noted that under the controlling statute, it should consider a number of factors. One of the factors it considered was Blanche's "financial condition and needs." With respect to this factor, the court opined that Blanche's "needs have been overstated in her financial declarations," but the court made no ruling about Blanche's financial condition and what her needs actually were. With respect to Blanche's earning

capacity, the court again noted that Blanche "claim[ed] she earns just a little better than minimum [wage] even though she is an experienced and sophisticated bookkeeper with many years of experience having run, managed, overseen and monitored millions of dollars in income and expenses that ran through the parties['] businesses." But the court made no further findings about her particular earning capacity as it related to a potential alimony award. The court also noted that there were "minor children in the home," five of whom were "younger than eighteen years of age or have not yet graduated from high school with their expected class." But the court made no findings about how (or how much) these children impacted Blanche's earning capacity. Finally, with respect to James's ability to pay alimony, the court found that James was a "voluntarily under employed" electrician, and it then opined that "[t]here is no question that [Blanche] claims that her needs exceed hers and [James's] monthly incomes." Considering these factors together, the court then ordered James to pay $8,286 per month in alimony.

*Marital Debts*

¶19 Finally, the court made certain findings concerning the "business debt" that was "incurred" by the parties during the marriage. While the divorce proceedings were pending, James filed a Chapter 7 bankruptcy petition. In the Ruling, the court found that, after the bankruptcy proceedings had begun, James incurred $30,000 in debt while purchasing stock in his business and business-related property from the bankruptcy trustee. Since the court determined that Blanche was "entitled to 50% of [the] value" of the business, the court then concluded that she was entitled to an award of $15,000 as a result of this debt.

¶20 The court also noted that Blanche had "received financial compensation from the sale of assets and the conversion of assets into cash." But the court opined that it was "difficult, if not impossible, to decipher whether each expenditure was personal, business related, or partially business-related." From this, and

without further explanation, the court awarded Blanche "judgment against [James] in the amount of $50,000."

2. Motions for Clarification

¶21 James and Blanche were both dissatisfied with the Ruling, and in January 2018, they each filed a motion requesting clarification. Each motion raised a host of issues regarding alleged errors.

¶22 Of note here, in her motion, Blanche asked for clarification "as to whether or not" she was entitled to $25,000 for the Eagle Mountain Home or, instead, "another amount." She argued that an award of $25,000 "seem[ed] incorrect mathematically" because if the fair market value of the Eagle Mountain Home was $606,000, and the home sold for $520,000, the "resulting equity would have been $86,000, which if divided equally would result in [Blanche] receiving judgment for $43,000," as opposed to $25,000. Blanche also requested clarification as to the court's determination "that the loss to the parties" concerning the Cedar Highlands Lots was $80,000. She argued that, based on the evidence presented at trial, the loss was $280,000. Blanche also requested clarification regarding the court's determination of marital debts, specifically, whether the $15,000 was "to be added to the $50,000 for a total of $65,000" or whether "there [was] another number the court considered." Finally, Blanche requested clarification of the court's order regarding child support, given that in one portion of its Ruling the court ordered James to pay child support in the amount of $3,781 per month, and in another portion it altered that amount to $3,336 per month.

¶23 In his motion, James likewise requested clarification of various aspects of the Ruling. Among other things, he asked the court to "enter supplemental, amended, and or additional findings" regarding its ruling that Blanche was "entitled to $100,000" concerning the Hildale Home, explaining that he was "unaware of any evidence upon which the [court] could have

relied in finding the $100,000 in equity the [court] awarded" Blanche. James also asked for clarification on the court's findings concerning the Henderson Home, Eagle Mountain Home, and Rockville Property, asserting that the court had not "identified the facts upon which it relied" in making its calculations. Regarding the Henderson Home, James alleged that the court's finding that "the parties would likely have had at least $100,000 in equity if the home had been rented" for the years 2013 through 2017 "fail[ed] to account for the costs of managing a rental property from a long distance, the likelihood of vacancies, the cost of utilities, maintenance, repairs, property taxes" and other related fees. Regarding the Eagle Mountain Home, James argued that the Ruling did not "accurately account for the additional $25,000" that Blanche received from the bankruptcy trustee "in addition to the $102,486.28 she received" from the sale. Regarding the Rockville Property, James requested clarification as to what facts the court relied upon to conclude that "the parties owned 28 shares of water," given that the evidence "actually showed," in his view, that they owned only 19 shares of water. Additionally, James requested clarification as to the court's comparison of the Rockville Property to a parcel of "11.4 acre[s] of land with Virgin River frontage that was listed for $1,195,000." Finally, with respect to the marital debts, James asked the court to "enter supplemental, amended and or additional findings" that would "identify the facts upon which [the court] relied in awarding [Blanche] $15,000 representing [the business's] hypothetical equity or value."

¶24    In the meantime, the Office of Recovery Services (ORS) intervened in the case based on its obligation to provide child support enforcement services. ORS filed a memo in response to Blanche's motion for clarification in which it likewise requested clarification of the child support amount. After recounting its view of the evidence, ORS recommended that if Blanche's income was imputed at minimum wage, and if James's income was imputed at $18,500 per month, James should be ordered to pay $3,236 per month for the five minor children.

¶25 In August 2018, the court issued a ruling on James's and Blanche's motions. With respect to the child support amount, the court now ordered that James's monthly obligation be $3,236 per month, thus apparently adopting ORS's recommendation. With respect to the properties, the court now ruled—without explanation—that Blanche was entitled to $25,000 in relation to the Eagle Mountain Home and $40,000 for the Cedar Highland Lots. And with respect to the marital debts, the court found— again without explanation—that "[t]he $15,000 amount awarded is to be added to the $50,000 amount awarded for a total of $65,000" to be awarded to Blanche.

¶26 The court ordered Blanche's counsel to prepare the final findings of fact and conclusions of law. In a November 2018 filing, however, Blanche alleged that she was unable to do so without "additional findings" regarding, among others, the marital debts. In May 2019, the court heard additional oral arguments. After the parties filed additional objections and motions, the case was reassigned from Judge Lynn Davis—who had heard the trial testimony and had issued both the Ruling and the rulings on the motions for clarification—to Judge Robert Lunnen. Judge Lunnen then heard oral arguments on the parties' objections and outstanding motions.

3. The Supplemental Decree

¶27 In April 2021, the court (through Judge Lunnen) issued a "Supplemental Decree of Divorce" (the Supplemental Decree).[4]

¶28 The Supplemental Decree reiterated and incorporated many of the findings and determinations from the Ruling. As in the Ruling, for example, the court awarded Blanche $100,000 for the Hildale Home, $50,000 for the Henderson Home, and the

---

4. As noted above, the court had previously entered a bifurcated divorce decree while the trial on the parties' assets and the like was still ongoing.

(clarified) amount of $40,000 for the Cedar Highlands Lots. But without explanation, the court altered the order regarding the Eagle Mountain Home, awarding Blanche $43,000 as opposed to the $25,000 that was previously ordered. Also without explanation, the court altered the order regarding the Rockville Property, first concluding that Blanche's offset should be $38,000, not $42,000, and now awarding Blanche $412,000 from this property as opposed to the $408,000 that had previously been awarded.

¶29 The court also determined that Blanche's income should be imputed at minimum wage for a total of $1,260 per month. Based on its findings about the parties' incomes, it then ordered James to pay $3,236 per month in child support, and it again ordered him to pay $8,286 per month in alimony.

¶30 Finally, the court awarded Blanche $65,000 relating to the marital debts. The court explained that $15,000 of that amount "represent[ed] her interest" in various purchases made by James from the bankruptcy trustee and that the remaining $50,000 represented "her interest in other assets, business and otherwise."

¶31 James timely appealed.

## ISSUE AND STANDARD OF REVIEW

¶32 James argues that the district court issued "inadequate" fact findings to explain its rulings regarding the marital properties, child support and alimony, and marital debts. "We review the legal adequacy of findings of fact for correctness as a question of law." *Lay v. Lay*, 2018 UT App 137, ¶ 4, 427 P.3d 1221 (quotation simplified); *see also Brown v. Babbitt*, 2015 UT App 161, ¶ 5, 353 P.3d 1262 ("We review the legal sufficiency of factual findings—that is, whether the trial court's factual findings are sufficient to support its legal conclusions—under a correction-of-

error standard, according no particular deference to the trial court." (quotation simplified)).[5]

ANALYSIS

¶33 A district court's "[f]indings of fact are adequate . . . only when they are sufficiently detailed to disclose the steps by which the district court reached its ultimate conclusion on each issue." *Oldroyd v. Oldroyd*, 2017 UT App 45, ¶ 5, 397 P.3d 645. When assessing a challenge to the adequacy of a district court's findings, we look to whether the court "adequately disclosed the analytic steps" it took in reaching its conclusions. *Keiter v. Keiter*, 2010 UT App 169, ¶ 21, 235 P.3d 782. In this sense, the court's findings of fact must show that its "judgment or decree follows logically

---

5. As evidenced by the passages quoted above, there's something of a disconnect in how we've referred to this kind of argument in past cases. In some cases, we've described it as an argument about the "legal adequacy" of the district court's findings, *see, e.g., Lay v. Lay*, 2018 UT App 137, ¶ 20, 427 P.3d 1221, but in others, we've described it as an argument about the "legal sufficiency" of the findings, *see, e.g., Brown v. Babbitt*, 2015 UT App 161, ¶ 5, 353 P.3d 1262. For consistency's sake, it might be better if bench and bar alike settled on a single usage. And on reflection, we suggest that such an argument should be described in *adequacy* terms.

    The reason for this is to reduce the potential for confusing this kind of argument with the similar sounding but substantively distinct "sufficiency of the evidence" argument. At the risk of over-simplification: a sufficiency of the evidence argument asserts that there was insufficient evidentiary support for a particular factual finding. As detailed more fully below, however, the argument at issue here—a challenge to the adequacy of the findings—asserts that the court's findings did not adequately explain the basis for the court's rulings, thereby impairing our ability to review those rulings (for sufficiency of the evidence or anything else).

from, and is supported by, the evidence." *Id.* ¶ 17 (quotation simplified). "This obligation facilitates meaningful appellate review and ensures the parties are informed of the trial court's reasoning." *Shuman v. Shuman*, 2017 UT App 192, ¶ 5, 406 P.3d 258; *see also Fish v. Fish*, 2016 UT App 125, ¶ 22, 379 P.3d 882 (explaining that findings "are adequate when they contain sufficient detail to permit appellate review to ensure that the district court's discretionary determination was rationally based"). While "unstated findings can be implied if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made," *Fish*, 2016 UT App 125, ¶ 22 (quotation simplified), we "will not imply any missing finding where there is a matrix of possible factual findings and we cannot ascertain the trial court's actual findings," *Hall v. Hall*, 858 P.2d 1018, 1025–26 (Utah Ct. App. 1993) (quotation simplified).

¶34　James argues that a number of the court's findings were inadequate. His arguments address three groups of findings—namely, findings regarding (I) marital properties, (II) child support and alimony, and (III) marital debts. We address each group in turn.[6]

---

6. Two notes are warranted at the outset—one about our usage patterns regarding the rulings at issue, and one about a threshold argument made by Blanche.

　　First, as discussed above, there are two decisions that largely drive the various arguments in this case: the Ruling and the Supplemental Decree. The Ruling was issued by Judge Davis, who heard the trial evidence, while the Supplemental Decree was issued by Judge Lunnen, who was assigned to the case after the Ruling was issued. At one of the hearings in the intervening period, Judge Lunnen responded to a party's argument by stating that "[t]he findings, they're set in stone. So all this is . . . a result of

(continued…)

the findings." As noted, however, Judge Lunnen did alter a few of the Ruling's legal determinations in the Supplemental Decree. In consequence of how this all played out, the Supplemental Decree recites many of the findings that were issued in the Ruling, though not with the same level of detail. It instead essentially incorporates the bulk of the Ruling by implicit reference. For this reason, the parties' arguments on appeal have largely focused on whether the findings from the Ruling were adequate, and we'll follow suit. To avoid redundancy, we won't repeatedly mention whether we think the findings from the Supplemental Decree were likewise inadequate (even if they were reiterated in the Supplemental Decree); instead, we'll discuss the Supplemental Decree only in those instances where it differs in some meaningful way from the Ruling (usually because of an altered legal determination).

Second, in her opening brief, Blanche argues that James did "not comply with Utah's marshaling requirement" in his briefing on appeal. But the marshaling requirement applies when a party "seeks to prevail in challenging the sufficiency of the evidence to support a factual finding or a verdict on appeal." *State v. Nielsen*, 2014 UT 10, ¶ 40, 326 P.3d 645; *see also State v. Wall*, 2020 UT App 36, ¶ 53, 460 P.3d 1058; *Wilson v. Sanders*, 2019 UT App 126, ¶ 17, 447 P.3d 1240. As noted, however, James is not arguing that there was insufficient evidence to support any particular finding. Rather, James is arguing that the findings were inadequate to explain the court's various rulings. As we've explained, an argument about the adequacy of the findings presents a legal question. Because of this, "marshaling is not required." *Jensen v. Jensen*, 2009 UT App 1, ¶ 8 n.3, 203 P.3d 1020; *see also Woodward v. Fazzio*, 823 P.2d 474, 477–78 (Utah Ct. App. 1991) ("There is, in effect, no need for an appellant to marshal the evidence when the findings are so inadequate that they cannot be meaningfully challenged as factual determinations. . . . Rather, appellant can simply argue the legal insufficiency of the court's findings as framed.").

## I. Marital Properties

¶35 James first challenges the adequacy of the findings that supported the rulings about how to value and distribute the parties' marital properties. We recognize at the outset that district courts "have considerable discretion in determining property distribution in divorce cases." *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 11, 440 P.3d 757 (quotation simplified). But while a district court "does not have to accept [a party's] proposed valuation" of an item in the marital estate, the court "does have to make findings sufficient to allow us to review and determine whether an equitable property award has been made." *Taft v. Taft*, 2016 UT App 135, ¶ 53, 379 P.3d 890. In ruling on such a claim, we will uphold a district court's "valuation of marital assets" if "the value is within the range of values established by all the testimony, and as long as the court's findings are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 64, 507 P.3d 385 (quotation simplified), *cert. denied*, 525 P.3d 1259 (Utah 2022).

### A.    The Hildale Home

¶36 James first argues that the court's findings regarding the Hildale Home were inadequate. In James's view, the court "simply concluded that $100,000 was an appropriate amount of an award without providing factual findings" supporting "the appropriateness" of that award. We agree.

¶37 The court's discussion of the Hildale Home spans roughly two pages of the Ruling. Much of the discussion concerns the ownership of the home. The court found that the home's title is held by the Trust, that James's interest in the home is that "of a beneficiary" to the Trust, and that Blanche, by contrast, is "not a legal beneficiary" of the Trust. But the court then found that "[n]o evidence was presented to the court of the

value [of] [James's] beneficial interest" in the Trust and that "establishing the value of a beneficial interest in property of the [Trust] is practically and legally impossible[,]" in part, because "the Trust is not receptive to, nor responsive to, legal inquiries." The court also recognized that Blanche submitted an appraisal of the home, but it then concluded that the appraisal was not an adequate mechanism for establishing the home's value because the appraisal failed to account for "title to the home being in the [Trust], the costs of getting the [Hildale Home] conveyed from the [Trust], or the thousands of dollars owed to the [court] appointed Trustee of the [Trust] which the Trustee is owed for administering the [Trust's] assets." After discounting its ability to rely on either James's interest in the Trust or Blanche's appraisal, the court ruled that the property was "a marital asset" to some "narrow extent." Without further explanation, it then ruled that while it couldn't grant title to Blanche, she was "entitled to an award of $100,000."

¶38 We recognize the difficulties that the court faced with this trial in general—as should be clear by now, this was a very complicated divorce with a lot of things to decide and divide. And as evidenced by the preceding paragraph, the nature of parties' apparent interest in the Hildale Home made the question of how to divide that interest particularly complicated. But even so, we see nothing in the Ruling that "adequately disclosed the analytic steps" the court took, *Keiter*, 2010 UT App 169, ¶ 21, when deciding that Blanche was entitled to $100,000. The court clearly explained what it thought it *couldn't* rely on, but it didn't explain what it thought it *could* rely on or how it arrived at this particular amount. Without such an explanation, James has no meaningful way to challenge that $100,000 award, nor do we have any meaningful way to assess whether it was legally warranted in light of the "matrix of possible factual findings" on this issue that are apparent from the record. *Hall*, 858 P.2d at 1025 (quotation simplified). We accordingly vacate this determination.

B.     The Henderson Home

¶39     James next argues that the court "did not provide any analysis" as to how it determined there was $100,000 in equity in the Henderson Home and that, as a result, the $50,000 award to Blanche was based on inadequate findings. We agree.

¶40     The court found that the home was purchased by James in 2004 for $420,000. It explained that by August 2012, James and Blanche were "months behind in their [mortgage] payment" and that they owed $288,000 when the home was "lost in a short sale in 2013 for $225,000." The court made a finding that the fair market value of the home at the time—according to Zillow—was $323,861.[7] The court found that James and Blanche "would likely have had at least $100,000 in equity to split if they had" managed to keep the home, but because James "ignored" Blanche's suggestions to rent the home out, which in theory would have prevented them from losing it, it then ruled that James "should be responsible to, and give [Blanche] credit for, $50,000 in equity representing her share of the lost asset dissipated by him." It appears the court thus based the $50,000 award on its finding that "the parties could likely have rented and made money as shown or just maintained [the Henderson Home] and sold it for profit presently."

¶41     James's initial argument here is that it's unclear how the court arrived at the $100,000 in equity that it then divided. In response, Blanche suggests that this amount could have been derived from the court's apparent acceptance of the home's fair market value as being $323,861 (a value derived from Zillow—which, again, neither party has challenged on appeal as being

---

7. While a topic at oral argument, neither party raised on appeal the issue of whether the district court could appropriately rely on Zillow for its valuation of the property, as opposed to evidence submitted at trial. For this reason, we do not address the issue here.

improper), an amount that is approximately (though, we note, not precisely) $100,000 more than the parties received in the short sale. We have some concern that Blanche is asking us to do too much inferential work on our own, and we could vacate on this basis alone. But in any event, the court's division of the apparent equity also seems to have been based on a dissipation (or, perhaps, a waste) determination stemming from James's conduct. Assuming this was so, the court's findings about James's conduct, whether the home could actually have been rented out, what the parties could have received in rent, and whether this unspoken amount would actually have prevented them from losing the home were all either missing or decidedly cursory. We've previously held, however, held that when a court rules that a party "should be held accountable for the dissipation of marital assets," the court must support the ruling with "sufficiently detailed findings of fact that explain the trial court's basis" for that ruling, and we've also laid out a number of factors that "may be relevant to" and could support such a ruling. *Rayner v. Rayner*, 2013 UT App 269, ¶¶ 19–21, 316 P.3d 455 (quotation simplified). While that list is not mandatory or exhaustive, we still have an inadequate findings-based foundation here from which we could review what seems to have been an implicit dissipation determination. When coupled with the lack of explanatory findings about the basis for the equity determination, we conclude that the findings about this home are, as a whole, legally inadequate to support meaningful appellate review of this ruling. We accordingly vacate them.

C.     The Eagle Mountain Home

¶42     James argues that the court's findings regarding the Eagle Mountain Home were legally inadequate. We agree.

¶43     In the Ruling, the court (through Judge Davis) initially awarded Blanche $25,000 for this home. But the court failed to explain the analytic steps it took to arrive at that amount. The court did enter a few findings about this home—namely, that the

parties made a $120,000 down payment when they purchased the home in 2009 ($80,000 of which was borrowed from James's mother), that they were forced to sell it in 2015 in conjunction with James's bankruptcy, and that, as a result of that sale, Blanche received "one half" of its equity. But the court made no findings about the sale price or how much equity the parties had in the home at the time of the sale. And then, without any explanation, the court opined that "[h]ad it not been lost to a forced sale," Blanche "would have been able to receive at least another $25,000 today" because of the home's "current market value." The court provided no basis for the $25,000 amount, and we see no reasonable basis in its findings for inferring one.

¶44    Of note, the court (through Judge Lunnen) then changed the awarded amount in the Supplemental Decree, now awarding Blanche $43,000 for it. But the court didn't explain why it increased this award from the award that had previously been entered in the Ruling. And while Blanche suggests on appeal that the court had now accepted a new valuation of the home that she offered in her motion for clarification, the court never said that it was doing so, nor did it provide any other explanation for why it increased this award at all, let alone by this particular amount.

¶45    In light of this procedural history, it's unclear to us what analytic steps led the court to first award Blanche $25,000 for this home and what caused the court to later change that award to $43,000. As a result, the findings with respect to this home are legally inadequate and are therefore vacated.

D.    The Rockville Property

¶46    James argues that the court's findings about the Rockville Property are legally inadequate because it's "not clear" how the court "reached its valuation of the Rockville Property" or how it divided that value as part of its division of the marital estate. We agree.

¶47　In the Ruling, the court explained that the Rockville Property was a "7.5 acre parcel of farm property" owned by James and Blanche near Rockville, Utah. As for its value and how to determine that value, the court pointed to three options: (1) it noted that a realtor had listed a similar 11.4 acre parcel for $1,195,000, though the court opined that this valuation was "debatable"; (2) the court noted that Blanche "discussed" its value with a realtor who "indicated back then" (which, though unsaid by the court, seems from context to have been in 2013) that the "lot was worth approximately $900,000, due to the 28 water rights attached to it"; and (3) the court pointed to a "[c]urrent market value analysis from Zillow" that "estimate[d]" the property's value at $1,195,000. The court then found that the parties were "forced to sell" the property in December 2013 for $270,000 due to financial troubles. And the court apparently faulted James for this, determining that at the time of the forced sale, the parties "only owed approximately $190,000" on the property, that it could have been refinanced, and that it was James's fault that they did not do so. From this, the court found that the forced sale "cost the parties at least $450,000 each," and it accordingly awarded Blanche "damages of $450,000 offset by monies she did receive in the amount of $42,000."

¶48　From an adequacy-of-the-findings perspective, the initial problem here is that the court never stated whether it was accepting $1,195,000 or $900,000 as the property's value. Given that the property's value would be the numerator for any division of it as a marital asset, this omission is, of course, significant. And while Blanche invites us to engage in some loose math that would account for both possibilities and arrive at the same endpoint, the difference between the two initial valuations might matter if James wished to mount a sufficiency of the evidence challenge. Moreover, to the extent that the court's determination about how to divide the property's value turned on an implicit dissipation determination, we again note that the court failed to support such a determination with adequate findings. And finally, while the

court offset the award to Blanche by "monies she did receive in the amount of $42,000," an amount that it later changed to $38,000 in the Supplemental Decree, the court didn't explain the basis for either amount in either ruling.[8]

¶49 Given the unanswered questions about how the court valued both this property and the offset, we have no basis for conducting a meaningful review of this award. We accordingly vacate it.

E. The Cedar Highlands Lots

¶50 James's final property-related challenge is to the findings regarding the Cedar Highlands Lots. In James's view, the court improperly failed to "indicate . . . how the $80,000 was calculated." We again agree.

¶51 In the Ruling, the court found that James and a business partner had purchased the two lots for $40,000 each, that Blanche had "controlled the book-keeping for the marital businesses," and that the lots "were lost when the parties were unable or could not pay the property taxes and Home Owners Association fees," thus "result[ing] in [an] $80,000 loss to the parties." In a subsequent ruling, the court determined that this loss should now result in an award of $40,000 to Blanche, and that award was later confirmed in the Supplemental Decree.

---

8. It seems possible (if not probable) that this offset was intended to reflect a determination that the parties received $80,000 in equity when they sold the property for $270,000 while still owing $190,000 on it. But if this was the determination, (1) the court didn't say so, and (2) it also didn't explain the basis for initially deviating upward by $2,000 to arrive at $42,000, nor did it explain the basis for subsequently deviating downward by $2,000 to arrive at $38,000.

¶52 From the court's findings, it's unclear why the court determined that there was an $80,000 loss. The court seems to have assumed that the lots were completely lost with no return in value, but the court never said so. And more importantly, even assuming that this was the implicit finding, the court never explained why it concluded that Blanche should receive an *award* of $40,000 as the result of this particular *loss* to the marital estate of $80,000. Without such an explanation, we have no meaningful basis for reviewing the ruling. As a result, we vacate it.

## II. Child Support and Alimony

¶53 James challenges the adequacy of the findings relating to child support and alimony. James's challenges here fall into two groups: first, he challenges the adequacy of the findings relating to Blanche's income (which, as explained below, matter to both child support and alimony); and second, with respect to the alimony determination, he challenges the adequacy of the court's findings relating to Blanche's financial condition and needs.

### A. Blanche's Income

¶54 James argues that the court's findings regarding Blanche's income were inadequate because they failed to "provide any reasoning for disregarding [Blanche's] earning capacity." We agree.

¶55 A party's income matters to a determination of both child support and alimony. First, with respect to child support, a "noncustodial parent's child support obligation is calculated using each parent's adjusted gross income." *Twitchell v. Twitchell*, 2022 UT App 49, ¶ 34, 509 P.3d 806 (quotation simplified); *see also* Utah Code §§ 78B-12-202, -301 (establishing guidelines for child support awards). Importantly, the court "is required to enter detailed and specific findings on all material issues which must be considered when making a child support award." *Breinholt v. Breinholt*, 905 P.2d 877, 881 (Utah Ct. App. 1995) (quotation

simplified). But "so long as the steps by which the ultimate conclusion on each factual issue was reached are apparent, a trial court may make findings, credibility determinations, or other assessments without detailing its justification for finding particular evidence more credible or persuasive than other evidence supporting a different outcome." *Shuman*, 2017 UT App 192, ¶ 6 (quotation simplified). Second, with respect to alimony, a court must examine, among other factors, "the recipient's earning capacity or ability to produce income." *Miner v. Miner*, 2021 UT App 77, ¶ 16, 496 P.3d 242 (quotation simplified). And a court must in "all cases . . . support its alimony determinations with adequate findings . . . on all material issues," and "failure to do so constitutes reversible error, unless pertinent facts in the record are clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Id.* ¶ 17 (quotation simplified).

¶56   Of note, when "there is insufficient evidence of one of the statutory alimony factors, courts may impute figures." *Gardner v. Gardner*, 2019 UT 61, ¶ 98, 452 P.3d 1134 (quotation simplified). For example, a "court may impute income to a former spouse for purposes of calculating alimony after finding that the former spouse is voluntarily unemployed or voluntarily underemployed." *Fish*, 2016 UT App 125, ¶ 15. And it "is not unusual for courts to impute income to a spouse who has not worked during the marriage (or who has not worked for a number of years preceding the divorce) but who is nevertheless *capable* of producing income." *Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 26, 461 P.3d 1134 (emphasis in original). But when a court imputes income, the "imputation cannot be premised upon mere conjecture; instead, it demands a careful and precise assessment requiring detailed findings." *Christensen v. Christensen*, 2017 UT App 120, ¶ 22, 400 P.3d 1219 (quotation simplified); *see also Reller v. Argenziano*, 2015 UT App 241, ¶ 33, 360 P.3d 768 ("Before imputing income to a parent, the trial court must enter findings of fact as to the evidentiary basis for the imputation." (quotation simplified)).

¶57 Income can likewise be imputed as part of a child support determination. *See* Utah Code § 78B-12-203(8). But, as with an alimony award, a court must support such an imputation with adequate findings. *See id.* § 78B-12-203(8)(a) (explaining that in contested cases, "[i]ncome may not be imputed to a parent unless," after an evidentiary hearing on the matter, the court "enters findings of fact as to the evidentiary basis or the imputation"); *id.* § 78B-12-203(8)(b) (detailing the evidentiary bases upon which a court may impute income for child support purposes); *see also Rayner*, 2013 UT App 269, ¶ 10 ("Imputation cannot be premised upon mere conjecture; instead, it demands a careful and precise assessment requiring detailed findings." (quotation simplified)).

¶58 Here, the court determined that although Blanche was currently working as a "self employed Uber/Lift driver," her "income cannot be imputed at more than minimum wage of $1,257 per month." In a different portion of the Ruling, however, the court found that Blanche's "gross income" should actually be imputed at "$1,260 per month."

¶59 On appeal, James doesn't focus on this three-dollar discrepancy. Rather, James argues that the court erred by failing to explain why Blanche's income should be imputed at minimum wage at all. As James points out, the court elsewhere found that Blanche is "an experienced bookkeeper with QuickBooks who has elected to be employed by About Faceology," and it further found that she was "an experienced and sophisticated bookkeeper with many years of experience having run, managed, overseen and monitored millions of dollars in income and expenses that ran through the parties['] businesses."

¶60 Having reviewed the Ruling, we see no explanation for the court's determination that, although Blanche is an experienced bookkeeper with the skill set to manage millions of dollars in income for a company, her income should still be imputed at minimum wage. In an attempt to justify this on appeal, Blanche

points to a passing statement from the alimony portion of the ruling in which the court noted that the parties "have ten children, five of which are younger than eighteen years of age or have not yet graduated from high school with their expected class." But as James points out in response, the parties had even more minor children at home during the years in which Blanche was working as a bookkeeper with responsibilities for "millions of dollars in income." And while it's possible that the court believed that something had now changed that would prevent Blanche from still doing this work (such as her new status as a post-divorce single parent), the court never said this or entered any findings to support such a determination, it never explained why it was implicitly determining that Blanche could work as an Uber/Lyft driver but not as a bookkeeper, and it entered no findings to explain why her current employment as an Uber/Lyft driver would result in an income imputation of minimum wage.

¶61  To be clear: as with the other issues in this appeal, we express no opinion about the proper resolution of any of these questions. But without an explanation from the district court, James has no basis for properly challenging the decision about Blanche's income, nor do we have an adequate basis for reviewing it. Given the importance of Blanche's income to both child support and alimony, we accordingly vacate those rulings.

B.    Blanche's Financial Condition and Needs

¶62  As part of its alimony determination, the court was also required to consider Blanche's "financial condition and needs." *Miner*, 2021 UT App 77, ¶ 16 (quotation simplified). James argues that the court failed to enter adequate findings to support this assessment. We agree.

¶63  In the Ruling, the court noted that Blanche had claimed that she had "monthly needs of $18,565," but it then concluded that these needs were "overstated." And while Blanche had also suggested that she needed the alimony award to account for "over

$200,000 in credit card and business debts," the court suggested that this debt was either accounted for by other portions of its ruling or had "been discharged in the bankruptcy case."

¶64   But even so, while the court then concluded that James "simply does not make sufficient money to satisfy all of [Blanche's] claims" about what "she reasonably needs to support herself," the court did not make any determination about what Blanche's needs actually are. As James correctly points out, the absence of such an explanation prevents us from conducting a meaningful review of how this factor should weigh into the court's alimony award, a problem that is compounded by the failure discussed above to adequately explain its determination about Blanche's income.

¶65   We accordingly vacate the alimony award to allow the court to enter more detailed findings and, "if necessary, recalculat[e] . . . appropriate alimony." *Fitzgerald v. Fitzgerald*, 2005 UT App 67U, para. 6 (quotation simplified); *see also Eberhard v. Eberhard*, 2019 UT App 114, ¶¶ 39–40, 449 P.3d 202 (faulting a district court for not "spelling out" "how much more [the petitioner] actually needs each month to pay down her debt and elevate herself to the marital standard of living," thus leaving the appellate court "unable to discern whether the alimony award, in fact, exceeds her needs").

### III. Marital Debts

¶66   Finally, James challenges the adequacy of the court's findings with respect to the parties' marital debts. We agree that these findings are inadequate.

¶67   "In issuing a divorce decree, a trial court must include an order specifying which party is responsible for the payment of joint debts, obligations, or liabilities of the parties contracted or incurred during marriage." *Fox v. Fox*, 2022 UT App 88, ¶ 32, 515 P.3d 481 (quotation simplified), *cert. denied*, 525 P.3d 1263 (Utah

2022); *see also* Utah Code § 30-3-5(3)(c)(i). Utah law "requires only a fair and equitable, not an equal, division of the marital debts." *Fox*, 2022 UT App 88, ¶ 32 (quotation simplified). A district court is in the "best position to weigh the evidence, determine credibility and arrive at factual conclusions"; as a result, a district court's division of marital debts is "entitled to a presumption of validity." *Mullins v. Mullins*, 2016 UT App 77, ¶ 20, 370 P.3d 1283 (quotation simplified). But, again, the district court must enter findings of fact that are "sufficiently detailed to disclose the steps by which [it] reached its ultimate conclusion on each issue." *Oldroyd*, 2017 UT App 45, ¶ 5.

¶68    Here, the court found that the "parties incurred business debt while married." James challenges the adequacy of the findings with respect to two of those debts.

¶69    First, the court found that as a result of James's bankruptcy, James took on $30,000 in debt to finance the purchase of his business's stock and other business-related property. In the court's view, Blanche was "entitled to 50% of [the] value" of the business, which meant, in its view, that she was also entitled to $15,000. But the court never explained why it concluded that Blanche was entitled to this amount. While it's possible, as Blanche now suggests, that the court thought that James had drawn the $30,000 from marital assets—and, thus, that $15,000 of it belonged to Blanche—the court didn't say this, and its reference to this as "$30,000" in "debt" that James had incurred is somewhat at odds with this inference. In the absence of any explanation, we vacate this ruling.

¶70    Second, at the close of the "Marital Debts" section of its ruling, the court found that Blanche had "received financial compensation from the sale of assets and the conversion of assets into cash." But it then opined that it was "difficult, if not impossible, to decipher whether each expenditure was personal, business related, or partially business-related." Without any further explanation, the court then held that Blanche

was "awarded judgment against [James] in the amount of $50,000."

¶71   It's entirely unclear to us what the basis for this $50,000 award was. So far as we can tell, the court seems to have concluded that Blanche had already received some prior distributions from marital assets and that she should now receive $50,000 more. But there's no explanation for how the court arrived at this particular amount, what the amount was linked to, or why it would be listed alongside an analysis of "Marital Debts." Without any such explanation, we vacate this award.

## CONCLUSION

¶72   We agree with James's assertion that the challenged findings were not legally adequate and that these inadequacies impaired both his ability to challenge the court's various rulings and our ability to review them. We accordingly vacate the above rulings and remand the case with instructions for the court to enter more detailed findings and then alter any of its rulings as may be necessary.

_____