**2023 UT App 103**

# THE UTAH COURT OF APPEALS

LUCAS ALLEN JOHN,
Appellee,
*v.*
CASSANDRA KATHLEEN JOHN,
Appellant.

Opinion
No. 20210506-CA
Filed September 14, 2023

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 164904953

Benjamin K. Lusty, Attorney for Appellant

Mary Deiss Brown, Attorney for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1     In Lucas Allen and Cassandra Kathleen John's divorce decree, the district court gave Lucas[1] sole legal and physical custody of the parties' daughter, Child. The decree gave Cassandra once-a-week virtual parent-time and in-person parent-time as often "as the parties agree, or as recommended by the reunification therapist." The court ordered that Cassandra's virtual parent-time "not be . . . monitored" but that her in-person parent-time be "subject to line-of-sight supervision." The court

---

1. As is our practice, because the parties share the same last name, we use their first names, with no disrespect intended by the apparent informality.

then outlined a "reunification" plan, with the goal of Cassandra's eventual transition to unsupervised parent-time with Child.

¶2 Cassandra contends that the district court erred by ordering supervised in-person parent-time without making the statutorily required finding of "evidence that [Child] would be subject to physical or emotional harm or child abuse . . . from [Cassandra] if left unsupervised with [her]." Utah Code § 30-3-34.5(1).[2] Cassandra also forwards multiple arguments in support of the assertion that the court erred by failing to provide, as required by statute, "specific goals and expectations" for her to meet "before unsupervised parent-time may be granted." *Id.* § 30-3-34.5(5). We conclude that the district court made an adequate finding of evidence that Child would be subject to physical or emotional harm from Cassandra if left unsupervised with her, and we conclude that each of Cassandra's arguments regarding specific goals and expectations is either mistaken or unpreserved. We therefore affirm.

BACKGROUND

¶3 Lucas and Cassandra married in March 2014. Child was born in September of that year. Cassandra had "engaged in drug use over the years," and "even though [Cassandra] was a stay-at-home mom," Lucas "hired a baby-sitter to take care of [Child] . . . because of [Cassandra's] drug use" and because "he feared for [Child's] safety."

---

2. After Cassandra filed her notice of appeal, Utah Code section 30-3-34.5 was amended to expand the number of crimes that qualify as child abuse under this section. *See* Act of Feb. 16, 2022, ch. 430, § 7, 2022 Utah Laws 3391, 3398. Because the amendment is not relevant to our analysis, we cite the current version of the code for convenience.

¶4     Soon after Child was born, Cassandra became pregnant with the parties' second child. When the second child was born, the baby "had substances in her system," "indicat[ing] that [Cassandra had been] engaging in activities that were potentially harmful to the . . . child." This child died shortly after her birth.[3]

¶5     The parties separated around May 2016, and Cassandra moved in with her boyfriend later that year. In August 2016, Lucas petitioned for divorce. The next month, he moved for temporary orders to grant him sole legal and physical custody of Child. He also requested that Cassandra's visitation time with Child be supervised and that Cassandra be ordered to submit to drug testing.

¶6     Around this time, Lucas and Cassandra were together "at a local restaurant" when Cassandra "took [Child], put her in the front seat of [a] truck without any car seat or any appropriate child restraints and then drove off," hitting Lucas with the truck in the process. A temporary protective order was entered against Cassandra because she had attempted to run Lucas over with her truck and abscond with Child. A hearing on the protective order was held in October 2016, at which the commissioner recommended dismissal of the protective order,[4] entry of a mutual restraining order, and the granting to Cassandra of "unsupervised parent time . . . with no overnights."

¶7     On December 8, 2016, a hearing was held on Lucas's Motion for Temporary Orders. Following the hearing, the court entered mutual restraining and no-contact orders against the parties, awarded Lucas temporary sole legal and physical custody of Child, and directed Cassandra to "submit to a hair follicle

---

3. The district court found that the second child's death "reportedly" "was not attributed to [Cassandra's potentially harmful activities] but was attributed to medical malpractice."

4. The protective order was dismissed in October 2016.

[drug] test before 5:00 p.m." that day. The court gave Cassandra parent-time "with . . . no overnights" and provisionally ordered that it be "facilitated" by a particular family friend. The court further instructed that if Cassandra's drug test came back positive, Lucas's attorney was to "call the court to schedule a telephone conference to determine the status moving forward."

¶8    Cassandra's hair follicle drug test came back positive for both cocaine and marijuana, and another hearing was held on December 20, 2016. Following that hearing, the court ordered that Cassandra's parent-time be subject to line-of-sight supervision and that Cassandra complete another drug test by January 9, 2017.

¶9    On January 9, 2017, Cassandra submitted an "unofficial" drug test showing negative results for a collection taken that day. At a review hearing on January 30, 2017, however, the commissioner was "concern[ed]" because the results of the January 9 unofficial test were "drastically different" than the results of the test on December 8, 2016. The commissioner therefore directed Cassandra to complete another drug test that day. The commissioner also ordered "continue[d] . . . supervised parent time, status quo," and set a review hearing for February 13, 2017.

¶10   Cassandra's drug test on January 30, 2017, came back positive for marijuana, and following the February 13 review hearing, the court ordered "expanded supervised parent-time" with "no overnight visits." It also ordered Cassandra to submit to a urinalysis by March 8, 2017, and it set another review hearing for March 13, 2017.

¶11   Cassandra took the required test before the March 13 review hearing, but she failed to submit the results. Her counsel (Counsel) nevertheless proffered at the hearing that the test had come back "positive for THC." The court ordered that Cassandra's parent-time remain subject to "direct line-of-sight" supervision "with no overnight visits."

¶12   "At some point"—likely during April 2017—Cassandra "moved to Idaho for several months." After a "stint in Louisiana," she then moved to Iowa and lived there with a boyfriend. Once she had left Utah, Cassandra did not request any review hearings or make any attempt to exercise in-person parent-time with Child. As a result, she was "around [Child] physically on [only] three occasions" between January 2017 and June 2021.

¶13   Eventually, in March 2021, after compromise negotiations proved only minimally successful, the court held a bench trial on the parties' outstanding issues. At the time of trial, Child was six years old.

¶14   Following trial, the court held a hearing to orally announce its rulings. To Cassandra's credit, the court found that she was "trying to make some changes in her life," including engaging in "therapy to resolve anger, trauma, and substance abuse" issues, and that she "appear[ed] to be improving." But the court found that Cassandra still "lack[ed] . . . maturity in her decision-making processes," "consider[ed] her own needs first and primary over [Child]'s," and might not be "completely emotionally stable." The court also found that Cassandra had engaged in "instances of violence" in the past (including the one that led to the temporary protective order noted above). And it found that Cassandra's failures to "give[] first priority to [Child]'s welfare" were due to her "history with drug abuse." Based on the foregoing findings, the court awarded Lucas sole legal and physical custody of Child.

¶15   The court then granted Cassandra supervised in-person parent-time at a frequency to be determined by a therapist and unsupervised virtual parent-time at least once per week. The court said that it thought there ought to be "some sort of ramping up" of supervised in-person visits and that a therapist should "come up with a schedule" for those visits after talking with Child, Cassandra, and Lucas to "see what's appropriate." The court further explained, "I expect that the therapist will come up with so many overnights so that [Cassandra] can practice with all

of those things, and then once she's completed the therapist's plan, then I would say that the standard relocation statute would then become effective." Counsel then asked whether "at that point"—i.e., when Cassandra had completed the therapist's plan—"supervision would no longer be required." The court responded, "I don't know, Counsel," "because there's . . . some ongoing drug issues . . . and we don't have any evidence . . . that she would have clean tests."

¶16 Counsel then asked if the court was going to make findings as to whether Child "would be in danger if she were with [Cassandra unsupervised]." In response, the court said:

> [G]iven that [Cassandra]'s not complied with the Court orders, it's not clear to me whether or not she's a danger to [Child] still. She hasn't completed the drug tests, et cetera, so given her noncompliance with the Court's prior temporary orders, she potentially could still be a danger; but given also that she hasn't been around [Child] physically except for three times, I just think that's problematic.[5]

¶17 Counsel then said, "So . . . [a]fter two things occur, if I understand correctly, then [Cassandra]'s parent time will be according to [section] 30-3-37 and unsupervised." He listed "one, the completion of the ramp up period as recommended by the

---

5. These oral findings were later memorialized in the court's written Findings of Fact and Conclusions of Law as follows:

> The Court finds that, given [Cassandra]'s noncompliance with the Court orders, including her failure to provide clean drug tests, it is not clear whether [she] is still a danger to [Child]. The Court finds it problematic that [Cassandra] has only been around [Child] physically on three occasions since 2016.

therapist; and two, . . . submitting to the Court a clean drug test." He asked, "Is that accurate?" The court responded that it could not "say that [Cassandra]'s going to go immediately to unsupervised [visitation] after the ramp up" because the court might "need some more information at that point."

¶18   Counsel then informed the court, "My understanding, your Honor, is that the Court needs to provide specific criteria that [Cassandra] needs to meet . . . in order to have supervision dismissed." The court replied, "I . . . don't know what the therapist is going to say, Counsel. So I think it's a little bit speculative. . . . What I'm going to have to see is what the therapist recommends, and then I can give you some further instructions at that point." It added, "But yes, we do need her to have clean drug tests . . . ." Then the court, Counsel, and Lucas's attorney discussed what the drug test requirements would be.

¶19   Counsel later asked, "Your Honor, what would be the time line and/or process for setting up what sounds like is a . . . review hearing on how we are going to . . . establish the criteria for having supervision lifted?" The court asked Lucas's attorney if she "want[ed] to respond," saying, "[Counsel] wants criteria on how to remove supervision." Lucas's attorney explained that she did not think there was "enough information . . . to anticipate . . . the factors that [the court was] going to have to consider" and that it seemed reasonable to "notice up a hearing after [the parties got] a lot of these things going[] and have enough information to go ahead." But the court indicated that it was "not going to notice up a hearing at [that] point." It directed the parties to "get the therapist on board first, and . . . to do that within three weeks," then to get "the drug test filed." The court said, "[A]fter I've reviewed these things[,] . . . I'd like to make sure that Cassandra is complying with everything, and that she's able to do what she needs to do." It further stated, "So I would like to do that as quickly as possible, [Counsel], but I don't know how long of a period it's going to take because it will also depend on whether or

not your client is able to do everything that's required. I hope that she does."

¶20 Counsel then, again, stated his interpretation of the process the court was explaining:

> [I]t sounds like . . . you're saying that there's a two-step process. That we won't be able to arrive at the criteria for . . . when supervision will be lifted until [Cassandra] has complied with everything the therapist has said and filed clean drug tests. Then we can come back to have a hearing to determine what the criteria are for supervision to be lifted; is that accurate?

¶21 At that point, the court turned to Lucas's attorney and asked whether she "[had] any objection" to the process Counsel had just summarized or whether she thought that supervision "should be lifted" as soon as Cassandra "completes the criteria" the court had already identified. She said that she thought "there might be concerns" even after Cassandra completes reunification therapy, although she did not "know what they would be." The court then said, "Let's just get through the therapy portion, and then I want to see what the reports are. . . . It could be likely that if she's successful with all of th[e] things [the therapist recommends] that the Court will lift supervision at that time."

¶22 Counsel once again spoke, seeking "to clarify" certain matters by asking, "[I]f after [Cassandra] has met with the therapist and complied with the therapist, the therapist recommends that supervision be lifted, . . . then would the Court accept that recommendation . . . or do we still need to meet to determine criteria for if and how supervision would be lifted?" The court replied that it "[did not] know the answer to that yet," saying, "[B]ut let's go through that, and if the therapist recommends it, if we need to have a discussion with the therapist

present, then we might need to do that, okay? Because I might . . . have some questions."

¶23    Counsel then asked the court to order that the therapist be an Association for Family and Conciliation Courts therapist, and the court agreed. Then the court said, "If there's no other questions, I do need to get to my next hearing." Counsel initially replied that he had "[n]o other questions" but then said, "Last question, your Honor. . . . [I]s the review hearing going to be . . . before you or the Commissioner?" The court answered that the review hearing would be before the court.

¶24    The court concluded the hearing and memorialized its oral rulings into written Findings of Fact and Conclusions of Law and a Decree of Divorce. Cassandra appeals.

ISSUES AND STANDARDS OF REVIEW

¶25    On appeal, Cassandra contends that the district court erred in two ways when it ordered supervised parent-time. First, she argues that the order of supervised parent-time was legally inappropriate under Utah Code section 30-3-34.5(1) because the court "did not find that Cassandra poses a present threat of harm" to Child. Second, she argues that the order of supervised parent-time was legally inappropriate under Utah Code section 30-3-34.5(5) because the court did not "provide specific goals and expectations for Cassandra to meet" in order to be granted unsupervised parent-time. "We generally will not disturb the district court's parent-time determination absent a showing that the court has abused its discretion. However, we review the district court's interpretation of a statute for correctness. Likewise, we review the legal adequacy of findings of fact for correctness as a question of law." *Lay v. Lay*, 2018 UT App 137, ¶ 4, 427 P.3d 1221 (cleaned up).

ANALYSIS

I. Adequacy of the District Court's Findings in Support of
Supervised Parent-Time

¶26   Cassandra argues that the district court erred in ordering supervised parent-time because it did not make the finding that the Utah Code mandates as a prerequisite to supervised parent-time. The pertinent portion of the relevant provision reads as follows:

> When necessary to protect a child and no less restrictive means is reasonably available . . . , a court may order supervised parent-time if the court finds evidence that the child would be subject to physical or emotional harm or child abuse, as described in Sections 76-5-109, 76-5-109.2, 76-5-109.3, and 76-5-114, from the noncustodial parent if left unsupervised with the noncustodial parent.

Utah Code § 30-3-34.5(1).

¶27   As an initial matter, we agree with Cassandra's assertion that this statute means that the court must find a *current risk of harm* to the child from unsupervised parent-time, "rather than merely [a] *past or historic risk of harm.*" (Emphasis added.) To require "evidence that the child *would be* subject to . . . harm or . . . abuse . . . if left unsupervised with the noncustodial parent," *id.* (emphasis added), is to require evidence of harm or abuse during a potential situation that would occur, if at all, in the future.[6] Thus, before ordering supervised parent-time, a court must find that

---

6. The phrase "would be" "can refer to" situations that "may or may not happen in the future." *The Modal WOULD to Express Unreal Situations*, Grammaring, https://www.grammaring.com/the-modal-would-to-express-unreal-situations [https://perma.cc/C2ZD-RBY5].

there is evidence that harm or abuse could occur in the future, not merely that harm or abuse, or a risk of harm or abuse, occurred or was present in the past.

¶28    That is not to say that the existence of harm, or a risk of harm, from a noncustodial parent in the past has no bearing on whether there is a risk of harm from that parent in the future. Evidence that harmful or potentially harmful circumstances from the past have recurred or have not substantially abated could certainly be probative of whether there is a risk of harm in the future.

¶29    Moreover, a court need not find that the child *definitely* would be subjected to harm or abuse if left unsupervised with the noncustodial parent. Rather, a court is required to find only "*evidence* that the child would be subject to . . . harm or . . . abuse" if left alone with the noncustodial parent. *Id.* (emphasis added). For this reason, we, like Cassandra, conclude that a finding of a presently existing *threat* or *risk* of harm or abuse is sufficient to support supervised parent-time under section 30-3-34.5(1).

¶30    However, we disagree with Cassandra that "the district court did not find that [she] presently poses a threat of harm to [Child] if she were [to be left] unsupervised with [Child]."

¶31    Cassandra's argument here is a challenge to the adequacy of the district court's findings, not to the sufficiency of the evidence.[7] When we assess the adequacy of findings, "we review

---

7. In *Cox v. Cox*, 2023 UT App 62, 532 P.3d 128, we recently explained that "a sufficiency of the evidence argument asserts that there was insufficient evidentiary support for a particular factual finding," while "a challenge to the adequacy of the findings . . . asserts that the court's findings did not adequately explain the basis for the court's rulings." *Id.* ¶ 32 n.5. The instant case presents another type of inadequate-findings argument—the argument
(continued…)

the [trial court's] written and oral findings of fact together to determine if they are [adequate] to support the trial court's rulings." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 17, 176 P.3d 476. *See generally* Utah R. Civ. P. 52(a)(1) ("The findings . . . may be stated in writing or orally following the close of the evidence."). This is particularly true when "the written findings are incomplete, inadequate, or ambiguous." *Bill Nay & Sons Excavating v. Neeley Constr. Co.*, 677 P.2d 1120, 1121 (Utah 1984). In those instances, the written findings "may be elaborated [on] or interpreted (in respects not inconsistent therewith) by reference to the trial court's . . . oral explanation of the decision." *Id.* This is one of those instances.

¶32 Cassandra supports her argument that the court failed to make the requisite finding by pointing to only one statement from the district court's written findings: "[I]t is not clear whether [Cassandra] is still a danger to [Child]." But the court orally supplied additional findings and reasoning. When asked if it was going to make findings as to whether "[Child] would be in danger if she were with [Cassandra]," the court replied, "[G]iven that [Cassandra has] not complied with the Court orders, it's not clear to me whether or not she's a danger to [Child] still. She hasn't completed the drug tests, et cetera, so given her noncompliance

that the trial court did not make a finding that is legally required as a prerequisite to a particular order. *See Hall v. Hall*, 858 P.2d 1018, 1025 (Utah Ct. App. 1993) (holding that the trial court's "findings on the whole" were inadequate because "they omit[ted] critical findings required by the statute"). While Cassandra argues that the district court did not make the legally required finding of a present risk of harm to Child if Child were to be left unsupervised with Cassandra, she does not make the separate argument that there is insufficient evidence to support a finding of such a present risk of harm. Thus, we review only the adequacy of the district court's findings, not the sufficiency of the evidence supporting those findings.

with the Court's prior temporary orders, *she potentially could still be a danger . . . .*" (Emphasis added.) The court then added that it also found it "problematic" that Cassandra "[had]n't been around [Child] physically except for three times" during the preceding four-plus years. Because Counsel, in posing the question, employed the phrase "[Child] would be in danger if she were with [Cassandra]" to summarize the requirement of a current threat of harm or abuse, we take the court's responsive statement that Cassandra "potentially could still be a danger" to Child to be a finding of a current threat of physical or emotional harm to Child if Child were to be left unsupervised with Cassandra.[8]

¶33 Our reading of the court's answer to Counsel's question is bolstered by the fact that it came on the heels of additional findings that Cassandra still "lack[ed] . . . maturity in her decision-making processes," that Cassandra still "consider[ed] her own needs first and primary over [Child]'s," that Cassandra still might not be "completely emotionally stable," and that Cassandra's failures to "give[] first priority to [Child]'s welfare" were linked to her "history with drug abuse." When the court's response to Counsel's question is viewed in the context of these and other findings, its import is unmistakable: Cassandra has a history of drug abuse, which, without objection, merited supervised parent-time in the past; since supervised parent-time was instituted, Cassandra has failed to provide a negative drug test; six-year-old Child has been in Cassandra's physical presence only three times over the course of four-plus years; and Cassandra remains immature, potentially emotionally unstable, and self-centered in

---

8. We also read the court's back-to-back statements that "it's not clear . . . whether or not [Cassandra *is*] a danger" and "[Cassandra] potentially could still be a danger" as the court's recognition that it need not find that Child definitely would be harmed if left unsupervised with Cassandra but that, instead, it need only find an existing risk of harm to Child through unsupervised visitation. *See supra* ¶¶ 16, 29.

relation to Child; accordingly, Cassandra "potentially could still be a danger" to Child in the present. This finding is adequate to support the court's order of supervised parent-time.[9]

### II. The District Court's Provision of Specific Goals and Expectations to Discontinue Supervised Parent-Time

¶34   When a court orders supervised parent-time, it must "provide specific goals and expectations for the noncustodial parent to accomplish before unsupervised parent-time may be granted." Utah Code § 30-3-34.5(5). Cassandra's initial brief on appeal states at least two, and perhaps three, independent arguments to support her assertion that the district court did not comply with section 30-3-34.5(5). We disagree with her first argument, and we conclude that her second possible argument and her third argument are unpreserved.

¶35   Cassandra's first argument regarding the district court's compliance with section 30-3-34.5(5) is that the court's orders "are

---

9. Cassandra also argues that supervised parent-time is "not the least restrictive means of protecting [Child]." However, her least-restrictive-means argument is a repackaging of her assertion that the district court failed to find a current risk of harm to Child from unsupervised parent-time with Cassandra. This is evident from her argument's circular premise—that "supervised parent time cannot constitute the least restrictive means of [protecting a child from harm from a noncustodial parent] if the [noncustodial] parent cannot be found to be a risk of harm." Additionally, Cassandra does not offer a plausible, less restrictive alternative for protecting Child during parent-time other than through supervision. *Cf. United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 816 (2000) ("*When a plausible, less restrictive alternative is offered* to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." (emphasis added)). For these reasons, Cassandra's least-restrictive-means argument is unavailing.

silent on the question of what conditions Cassandra must meet prior to [the] lifting of supervised parent time" and that, because of this purported silence, "the district court erred." Cassandra is mistaken, however.

¶36　After Counsel informed the court of his understanding that the court "need[ed] to provide specific criteria that [Cassandra] needs to meet . . . in order to have supervision dismissed," the court said that it "need[ed] her to have clean drug tests" and also directed the parties to "get [a] therapist on board . . . within three weeks." Moreover, Cassandra acknowledges that the court ordered her to complete reunification therapy. The court repeated these requirements multiple times. Plainly, the court provided three specific goals or expectations for Cassandra to meet before unsupervised parent-time would be granted: (1) Cassandra needed to provide clean drug tests in connection with her supervised visitation; (2) Cassandra needed to work with Lucas to identify a therapist within three weeks; and (3) Cassandra needed to complete reunification therapy as determined by the therapist. Thus, Cassandra's first argument fails.

¶37　Next, Cassandra asserts that the district court did not comply with Utah Code section 30-3-34.5(5) because the court did not say that "completion of reunification therapy . . . [was] a condition precedent to lifting supervised parent time."[10] What Cassandra means by this assertion is not clear. If what she means is that completion of reunification therapy is not a condition the court expected her to meet before supervision would be lifted, this is merely a restatement of Cassandra's first argument and Cassandra is simply mistaken, as we have explained. On the other hand, if what she means is that to comply with section 30-3-34.5(5), a court must identify *at the time it orders supervised*

---

10. A "condition precedent" is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Condition precedent*, Black's Law Dictionary (11th ed. 2019).

*parent-time* a *comprehensive list* of the things the parent must do to receive a guarantee that supervision will be lifted, she did not preserve this potential issue for our review.

¶38   "In order to preserve an issue for appeal," the appellant must have "presented [it] to the trial court in such a way that the trial court ha[d] an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (cleaned up). "For a trial court to be afforded an opportunity to correct [an asserted] error (1) the issue must be raised in a timely fashion, (2) the issue must be specifically raised, and (3) the challenging party must introduce supporting evidence or relevant legal authority." *Id.* (cleaned up). As to the second of these requirements, "an objection must at least be raised to a level of consciousness such that the trial court can consider it." *State v. Cruz*, 2005 UT 45, ¶ 33, 122 P.3d 543 (cleaned up).

¶39   Here, Counsel indicated to the district court that his "understanding" was "that the Court needs to provide specific criteria that [Cassandra] needs to meet . . . in order to have supervision dismissed." The court then identified or reiterated three specific criteria for Cassandra to meet, as we have explained. Counsel then repeated, over the course of a lengthy discussion, essentially the same question three times. First, he asked, "[W]hat would be the time line and/or process for setting up what sounds like is a . . . review hearing on how we are going to . . . establish the criteria for having supervision lifted?" The second time he described "a two-step process" in which the parties "won't be able to arrive at the criteria for" lifting supervision "until [Cassandra] has complied with everything the therapist has said and filed clean drug tests" and they then "come back to have a hearing to determine what the criteria are for supervision to be lifted." He asked the court, "[I]s that accurate?" Finally, "to clarify," he asked a third time whether—"after [Cassandra] has met with the therapist and complied with the therapist"—if "the therapist recommends that supervision be lifted, . . . would the Court accept that recommendation . . . or do we still need to meet to determine

criteria for if and how supervision would be lifted?" Each of these questions came after the court had iterated or reiterated specific initial expectations for Cassandra to meet to have supervision lifted. In that context, each of Counsel's foregoing questions can be fairly understood as an attempt to clarify when or whether *additional* expectations would be set, not as an objection to the fact that the court had not identified a comprehensive set of expectations at the outset.

¶40 Indeed, after the second of the foregoing questions from Counsel, the court turned to *Lucas's* attorney and asked if *she* objected to the process Counsel had just summarized. This clearly indicates that the court did not understand Counsel's question to be an objection but rather an attempt at clarification. Thereafter, Counsel emphasized the notion that he was attempting to gain clarity rather than objecting when he explicitly prefaced the third of his questions by stating that he was seeking "to clarify." Then, after the court reiterated for the third time its initial expectation—for Cassandra to "go through" therapy—it said, "If there's no other questions, I do need to get to my next hearing." Cassandra's counsel responded not by objecting but by saying: "Last question, your Honor. . . . [I]s the review hearing going to be . . . before you or the Commissioner?"

¶41 Given the foregoing, we conclude that even if Counsel was trying to raise an objection to the fact that the district court had not provided a comprehensive set of expectations for Cassandra to meet in order to have supervision of her parent-time lifted, he did not raise that objection to a level of consciousness in the mind of the court such that the court could consider it. Accordingly, this potential issue was not preserved for our review. *See Cruz*, 2005 UT 45, ¶ 33; *State v. Olsen*, 860 P.2d 332, 336 (Utah 1993) ("A party who fails to make a clear and timely objection waives the right to raise the issue at the appellate level." (cleaned up)).

¶42 Finally, Cassandra argues that the expectation that she complete reunification therapy as determined by a therapist

before she is allowed unsupervised parent-time violates section 30-3-34.5(5) because that section "does not allow the district court to delegate the [setting of conditions for the lifting of supervision] to a therapist." Again, she did not raise this issue below. Because it is unpreserved, we do not address it. *See True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 32, 427 P.3d 338 (stating that "an argument based upon an entirely distinct legal theory is a new claim or issue and must be separately preserved" (cleaned up)).

## CONCLUSION

¶43 The district court made an adequate finding that Cassandra posed a present risk of harm to Child if Child were to be left unsupervised with her. Additionally, Cassandra's first argument in support of a conclusion that the district court failed to comply with Utah Code section 30-3-34.5(5) by not providing specific goals and expectations for Cassandra to meet before being granted unsupervised parent-time is mistaken, and her other arguments in support of that conclusion were unpreserved. We therefore affirm.

_____